## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| LEARJET, INC. and | ) | |
| BOMBARDIER AEROSPACE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 05-1074-DWB |
| | ) | |
| MPC PRODUCTS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Before the Court are the following motions and partial motions for summary

judgment, along with corresponding responses and replies:

1.    Defendant MPC Products Corporation's ("MPC's") motion for
summary judgment on plaintiff Bombardier Aerospace
Corporation d/b/a Flexjet's ("Flexjet's")[1] claims for breach of
express warranty and breach of implied warranty (Docs. 135,
136), Flexjet's response (Doc. 150), and MPC's reply (Doc.
162);

2.    MPC's partial motion for summary judgment on plaintiff
Learjet, Inc.'s ("Learjet's") claim for "interim lift" charges
which make up a portion of Learjet's damages claim (Docs.
137, 138), Learjet's response (Doc. 148), and MPC's reply

_____

[1] Flexjet is an operating division of Bombardier Aerospace Corporation.  (Doc.
150 at 5.)

1

(Doc. 163);

3.  MPC's partial motion for summary judgment on Learjet's claims for fraud and punitive damages (Docs. 139, 140), Learjet's response (Doc. 153), and MPC's reply (Doc. 164); and

4.  Learjet and Flexjet's joint partial motion for summary judgment on their claim against MPC for breach of express warranty based on a 2001 procurement contract and Learjet's motion for summary judgment on MPC's counterclaim for breach of contract (Docs. 141, 142), MPC's response (Doc. 152), and Learjet and Flexjet's joint reply (Doc. 165).

In addition, plaintiffs jointly filed affidavits from their experts supporting the expert reports submitted as part of plaintiffs' responses to MPC's motions. (Docs. 159, 160, 161.) All briefing related to these motions has been filed under seal as a result of an order of this Court. (Docs. 133,134.)

This case stems from a March 13, 2003 emergency landing of a Learjet Business Jet Model 45 ("Model 45") owned by Singapore Flying College (referred to by the parties as "the Singapore Incident"). Shortly after that emergency landing, the Federal Aviation Administration ("FAA") briefly grounded part of the Model 45 fleet, and subsequently grounded the entire fleet of Model 45s for a longer period of time. The FAA believed that the horizontal stabilizer trim actuator assembly ("HSTAA") for the Model 45s failed and caused the need for the emergency landing.

2

Plaintiffs and defendant make claims against each other based on each party's involvement with the HSTAAs and Model 45s.  Learjet is the manufacturer of the Model 45, Flexjet is an owner/operator of Model 45s, and MPC is the manufacturer of the HSTAAs at issue.  Highly summarized, plaintiffs claim MPC caused damages stemming from the FAA's grounding of the Model 45 fleet, and MPC claims Learjet failed to pay monies due under the parties' contracts.

For the reasons stated more fully herein: MPC's motion on Flexjet's claims (Doc. 135) is denied, MPC's motion on Learjet's interim lift damages (Doc. 137) is denied, MPC's motion on Learjet's fraud claims (Doc. 139) is granted in part and denied in part, and plaintiffs' joint motion regarding breach of warranty and Learjet's motion on MPC's counterclaim (Doc. 141) is granted in part and denied in part.

## I.  PROCEDURAL HISTORY

Before proceeding, an identification of the claims made in this litigation is useful.  Learjet and Flexjet filed suit against MPC in March 2005.  After several modifications,[2] plaintiffs' complaint brings the following claims:

Count I: Learjet's claim that MPC breached a 1994 purchase

---

[2]  The Court recently denied MPC's attempt to further supplement the pleadings, finding that supplementation would cause "additional and uncertain delay in resolving the case as presently defined."  (Doc. 126 at 4.)

agreement;

Count II: Learjet's claim that MPC breached express warranties in relation to the 1994 purchase agreement;

Count III: Learjet's claim that MPC breached the implied warranty of merchantability and the implied warranty of fitness for a particular purpose in relation to the 1994 purchase agreement;

Count IV: Learjet's claim that MPC breached a 2001 procurement contract;

Count V: Learjet's claim that MPC breached express warranties in relation to the 2001 procurement contract;

Count VI: Learjet's claim that MPC breached the implied warranty of merchantability and the implied warranty of fitness for a particular purpose in relation to the 2001 procurement contract;

Count VII: Flexjet's claim that MPC breached express warranties in relation to Flexjet's purchase of Model 45s in relation to the 1994 purchase agreement;

Count VIII: Flexjet's claim that MPC breached the implied warranty of merchantability and the implied warranty of fitness for a particular purpose in relation to the 1994 purchase agreement;

Count IX: Flexjet's claim that MPC breached express warranties in relation to Flexjet's purchase of Model 45s in relation to the 2001 procurement contract;

Count X: Flexjet's claim that MPC breached the implied warranty of merchantability and the implied warranty of fitness for a particular purpose in relation to the 2001 procurement contract; and

4

Count XI: Learjet's claim for fraud and misrepresentation
against MPC, based on:

- false representations of material facts to induce Learjet to enter
the 1994 purchase agreement

- false representations of promises of future events to induce
Learjet to enter the 1994 purchase agreement

- false representations of material facts to induce Learjet to enter
the 2001 procurement contract

- false representations of promises of future events to induce
Learjet to enter the 2001 procurement contract.

(Doc. 41, Third Amended Complaint.)  In Count XI, Learjet lists numerous

specific alleged examples of material facts and future promises by MPC which it

claims were fraudulent.  (Doc. 41 at 21-28.)

MPC answered plaintiffs' complaint, asserting defenses and affirmative

defenses, and also bringing a counterclaim against Learjet.  (Docs. 18, 38, 53, 103.)

MPC's counterclaim is for breach of contract based on Learjet's refusal to pay for

several categories of work allegedly completed on the HSTAAs from 1994 through

June 2004.  (Doc. 18 at 3-5.)

## II.  FACTUAL BACKGROUND

The parties' business relationship extends at least fifteen years, and is

5

apparently ongoing.  As a result, a detailed recitation of the facts is necessary.[3]

## A.  The Model 45 and MPC's Initial Involvement

Learjet decided to introduce the Model 45 into the market in the early 1990s. The Model 45 was to be a new design or "clean sheet of paper" design.  Learjet issued a request for proposal ("RFP") for the supply of the HSTAA for the Model 45 in November 1992.  The RFP was issued to MPC and others.  A basic source control document ("SCD") was provided with the RFP and that document described the requirements and functions of the HSTAA for the Model 45.  MPC probably received a RFP after some investigation was performed by Learjet of MPC's abilities, because Kevin Sprouse of MPC had expressed MPC's interest in doing work on the Model 45.

Initially, MPC "no bid" the HSTAA RFP.  However, Learjet asked MPC to reconsider and to submit a bid.  MPC responded in writing to the RFP on March 16, 1993.  MPC went through Learjet's evaluation process and MPC's response to the RFP was distributed in the Learjet organization for review by engineering, quality assurance, and product support.  Learjet engineering was tasked with the

---

[3] All facts set forth are either uncontroverted, or, if controverted, taken in the light most favorable, along with all favorable inferences, to the nonmovant.  See Hall v. United Parcel Serv., No. Civ. A. 992467-CM, 2000 WL 1114841, at *5 (D. Kan. July 31, 2000) (citing Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998)).  To the extent relevant, the factual disagreements between the parties will be noted.

responsibility to determine if MPC had the required experience to supply the

Model 45 HSTAA.  The basic SCD was the starting point for negotiations over a

design for the HSTAA.  Learjet's engineering team evaluated the MPC proposed

design for the HSTAA and agreed that it would meet the requirements of the

Model 45.  MPC's engineering team agreed to build the HSTAA to those

requirements.  Learjet and MPC then, in a "team" approach, determined the

technical requirements for the HSTAA that MPC would ultimately build.

**B.  The Parties' 1994 Agreements**

In May 1994, MPC and Learjet entered into an agreement for the supply of

HSTAAs for the Model 45 (the "1994 contract")[4].  The 1994 contract was signed

after more than a year and a half of give and take between Learjet's and MPC's

engineering departments concerning the HSTAAs' design.  The SCD attached to

the 1994 contract was the parties' agreed description at that point of what the

HSTAA had to do, and Learjet's requirements and specifications for the part.  The

1994 contract made MPC responsible for the design, development, certification,

and subsequent manufacturing and supplying of the HSTAA to Learjet for

---

[4] The pending motions all reference three agreements: the 1994 Contract, the 1994 Product Support Agreement and the 2001 Contract.  Copies of these three agreements are attached as exhibits to various supporting briefs, and the Court will refer to these three agreements throughout this Memorandum and Order without citation to any specific document or exhibit number.

installation on Model 45s.

Article 4.1 of the 1994 contract states that MPC "shall be responsible for all nonrecurring costs associated with the design, development and certification of the HSTAA."  Article 5 of the 1994 contract also states: "[MPC] acknowledges competency to design, manufacture and certify HSTAA for the Model 45 aircraft development and production. [MPC] agrees to bear all risk of providing adequate facilities, manpower, expertise and equipment to perform this Agreement and any Purchase Order issued hereunder in accordance with the Model 45 Program."  Regarding modifications made by MPC, Article 6 of the 1994 contract states: "[MPC] shall reimburse [Learjet] for reasonable [Learjet] costs and expenses incurred as a result of modifications implemented without the review and authorization of [Learjet]."  Regarding other modifications and changes, Article 6 provides:

> Both [Learjet] and [MPC] recognize that changes and modifications create added costs and schedule risks and, therefore, agree to cooperate to minimize the number of changes and handle changes to protect schedule and minimize costs.  "Minor" changes are expected and considered part of the base pricing.  The cumulative impact of the "Minor" changes will be tracked and added to the base price when they exceed three percent (3%).
>
> [Learjet] shall establish a procedure for ensuring [MPC] is fully informed of all such proposed modifications and changes.

8

[MPC] shall not make any modifications or changes affecting form, fit, function, performance, weight or interchangeability without prior agreement.

[Learjet] reserves the right to reject modifications which are not essential to meet the requirements of the [Learjet] Specification or the Airworthiness Authorities. [Learjet] shall not be liable for the cost for any change introduced by [MPC] unless [Learjet] agrees to accept partial or total liability for these costs. Modification as a result of design deficiency will be accomplished by [MPC] at no cost to [Learjet].

[MPC] shall reimburse [Learjet] for reasonable [Learjet] costs and expenses incurred as a result of modifications implemented without the review and authorization of [Learjet].

[MPC] shall make or cause such changes to be made as directed by relevant Government regulatory agencies or as a result of new Government requirements and may, at its option, negotiate costs for changes with [Learjet]. Any additional costs will be amortized over the balance of 300 shipsets.

[MPC] shall provide the necessary support services to ensure modifications and changes are incorporated with minimum disruption.

[MPC] shall pursue an ongoing improvement policy throughout the life of this Agreement. The growth potential of the System shall be demonstrated in accordance with the requirements of the Technical Specification.

Any "alterations or additions" to the 1994 contract had to "be agreed to in writing by both parties." Finally, Article 13.1.2 of the 1994 contract states:

9

> If [MPC] fails to deliver conforming equipment, [MPC] shall pay the difference between the value of the equipment delivered and the value they would have had if they had been as warranted.  Additionally, damages for failure to deliver conforming equipment could include, but are not limited to, loss of profits on sales, direct and indirect costs as a result of loss in production.  Claims made by [Learjet] shall be detailed and reasonably substantiated.

At the time the 1994 contract was entered into by the parties, the parties anticipated continuing engineering work to fine tune the specifications and change the specifications based on a final configuration and design of the HSTAA.

Subsequently, a November 30, 1994 product support agreement was executed.  The 1994 product support agreement purported to exclude express warranties not contained in the 1994 contract or 1994 product support agreement and to exclude implied warranties.  The 1994 product support agreement stated that MPC "in no event shall" be liable to Learjet, or to Learjet's customers, for any incidental or consequential damages.

To induce Learjet to consider MPC as the exclusive vendor for HSTAAs for the Model 45, MPC made numerous representations of fact and of future promises in its response to Learjet's RFP.  To induce Learjet to enter into the 1994 contract and 1994 product support agreement, MPC agreed to and represented it intended to perform a variety of promises.  Ultimately, it is uncontroverted that MPC represented in writing that it was the party "responsible for the design,

10

development, certification and subsequent supply" of the HSTAA units, "the

designing authority for the [HSTAA]," that Learjet did and was entitled to rely

upon MPC as a "competent expert in the design and manufacture of the

[HSTAA]," and that MPC had "full design responsibility for the [HSTAA] under

this Contract and is solely liable for any defects resulting directly or indirectly

from design, whether or not Learjet commented or had any role in [MPC's] design

activity."

The Model 45 received its FAA airworthiness certification in 1997 and use

of the -001 version[5] of the HSTAA was approved as part of that certification.  The

HSTAA was qualified, meaning it went through qualification procedures and

testing aimed to demonstrate that the part met performance specifications and

requirements.  At the time of initial FAA certification, MPC was manufacturing,

and Learjet was installing on Model 45 aircraft, the HSTAA unit designated as the

-001.

**C.  The Parties Continued Relationship in the 2000s**

In late 2000, MPC identified cracking in the thin key way section of acme

screws in two fielded -001 HSTAAs.  The cracking occurred much earlier in the    -

---

[5]  In describing the various generations of the HSTAA, the Court will use Learjet's
numerical designations rather than the alphabetical designations assigned by MPC.

001 HSTAAs' service life than expected.  By September 2000, it was clear the -001 HSTAA was not meeting the contractual requirement regarding flight hour averages, field removal rates were high, support inventory at MPC could not keep up with the removal rates and customer satisfaction with the actuator was very low.

As a result, the parties agreed to redesign the HSTAA to make the gear and acme screw one part.  At the same time, the -001 HSTAA was also redesigned to address moisture ingress and amber dash[6] issues.  In late 2000, MPC recommended to Learjet that Learjet notify Model 45 operators that they should make advanced inspections/replacements of -001 HSTAA from the 4800 hour inspection, which was the inspection/replacement interval then in Learjet's service manual, to between 300 and 600 hours.  Learjet did not adopt MPC's proposal. MPC's proposal would have required every -001 HSTAA unit to be replaced in 1/16 or 1/8 of the 4800 hour service life guarantee.  MPC refused to make any proposal about who would bear the cost of those early replacements. After discussions between Learjet and MPC, it was agreed that the -001 HSTAAs would be replaced during routine maintenance, without a specific reduction in the then-existing 4800 flight hour interval.

_____

[6]  An "amber dash" is a false error message.

After the term of the 1994 contract and product support agreement ended in November 2000,[7] a June 21, 2001 procurement contract was executed by the parties concerning the continued supply of HSTAAs for the Model 45 (the "2001 contract").[8] Unlike the 1994 contract, the 2001 contract does not contain any waiver by Learjet or limitation or exclusion by MPC of consequential or incidental damages.

To induce Learjet to enter into the 2001 contract, MPC agreed to and represented it intended to perform a variety of promises. Part of the sales presentation by Kevin Sprouse, MPC's sales manager in 1994 and 2001 and the primary negotiator on the two contracts, was to tell a customer that MPC could meet the customer's quality standards and those standards would be followed on the project. Sprouse knew Learjet, as a manufacturer of aviation components, had a quality control system. Sprouse told Learjet that MPC met quality standards, including the minimum standards set forth and enforced by the FAA in the Federal Aviation Regulations.

_____

[7] The 1994 contracts were extended by agreement of the parties in order to negotiate the 2001 contract.

[8] Many portions of the 2001 contract are pertinent to the summary judgment motions under consideration by the Court. However, rather than quote at length from the 2001 contract in the factual portion of this order, the Court will quote the pertinent sections in its analysis.

A new HSTAA design (the -005), with the one-piece acme screw, enhancements to address moisture ingress problems and to resolve the amber dash issue, was tested, as required by the FAA and Learjet, and then certified in July 2001.  After Learjet obtained FAA certification for the MPC -005 HSTAA unit, MPC began shipping -005 units.  In the fall of 2001, MPC and Learjet agreed to a price of $5075/each HSTAA to modify the existing -001 HSTAA to the newer version, the -005 HSTAA.  MPC absorbed its past and future costs attributable to addressing the key way issue; each party absorbed some of the costs concerning the moisture ingress issue; and Learjet agreed to compensate MPC for the modification that addressed the amber dash issue.  Between July 2001 and March 2003, Learjet paid and MPC accepted $5075 for each such "overhaul."

**D.  Flexjet**

Flexjet is an operating division of Bombardier Aerospace Corporation. Flexjet is in the business of selling fractional ownership of aircraft to individuals and corporations by which it provides a turnkey service of business transportation by business aircraft.  Flexjet's customers purchase a 1/16 or more interest in an aircraft and enter into (a) an agreement with Flexjet for the management of the aircraft and (b) an interchange agreement that allows sharing of aircraft within the program.  Under the management agreement, Flexjet is responsible for managing

14

the aircraft within the program and providing business aircraft for the customer's transportation, i.e., Flexjet performs the maintenance, flight planning/scheduling, fueling, and crewing of the aircraft.  Under the interchange agreement, the fractional owners, Flexjet's customers, are entitled to use aircraft in the program's "fleet" owned by other customers.

Upon initial acquisition of a Model 45, Flexjet was the owner of the aircraft. As it sold off fractional interests, Flexjet's ownership interest was reduced until eventually that aircraft would be owned by its fractional owners. Flexjet would then use the aircraft, through its management agreement with the fractional owners. Pursuant to Flexjet's agreement with each fractional owner, after a period of 24 months the fractional owner had the right to sell its fractional interest back to Flexjet, and some fractional owners of Model 45s did so.  Thus, at any single point in time, Flexjet could be a full owner, a fractional owner, or simply a user of a Model 45 aircraft.

Once Flexjet sold all sixteen shares of a particular Model 45 to its customers, it retained no ownership interest in the aircraft.  Unsold shares were owned by Bombardier Aerospace Corporation.  In 2003, nearly all of Flexjet's program "fleet" of Model 45s were owned by Flexjet customers.  But, in 2003, Bombardier Aerospace Corporation did hold ownership interests in some Model 45

aircraft in Flexjet's fleet.  During the period between the March 2003 Singapore

incident, and the date in October 2003 when all Model 45 aircraft were re-certified

with new HSTAA (a complete discussion of this chain of events is set out below),

Flexjet owned at least a fractional interest in approximately three Model 45

aircraft, and used approximately twenty-nine other Model 45 aircraft.

If Flexjet did hold a partial ownership interest in a Model 45, it assumed the

additional responsibilities set forth in the Federal Aviation Regulations as an

owner.  During 2003, the Model 45 aircraft in Flexjet's fleet were flown

approximately 50 to 100 flight hours a month, depending on the aircraft, always by

pilots who were employees of Flexjet.  Flexjet operated the Model 45 aircraft

virtually every day as a manager, operator, and owner.

As a result of the March 13, 2003 Singapore incident, Flexjet claims

damages for the following four categories of expenses:

> Deadhead expense: Flexjet's positioning expense, calculated by "flight hours," for aircraft to get to a maintenance facility after the groundings;

> Operational upgrade expense: Flexjet's expense to provide a "greater" or upgraded aircraft for customers under the terms of Flexjet maintenance agreement when Model 45s were not available because of the groundings;

> Supplemental lift expense: Flexjet's net increased expense for charter of aircraft not within its "fleet" to meet its obligations under the management agreement to make

aircraft available to its customers during the groundings; and

Flight crew expense: Sums paid by Flexjet to its pilots to transport them to their base locations after the groundings and for the pilots' salaries during the groundings.

## E.  The March 2003 Singapore Incident

On March 13, 2003, a Model 45 experienced severe vibration followed by a rapid nose-down pitch change.  This happened as a result of a cascading failure within the aircraft's HSTAA, which is believed to have initiated with cracking in the high stress area of the key way in the -001 HSTAA's acme screw.  The March 2003 incident resulted in a partial grounding of Model 45s on March 20, 2003.  At that time, the FAA directed, via an "Airworthiness Directive," that Model 45s with -001 HSTAA were not to be flown until they were overhauled to the -005 version HSTAA.  The March 2003 airworthiness directive was disseminated on an emergency basis and called for an immediate grounding of all Model 45 aircraft with an MPC HSTAA bearing part number -001.  The directive stated that it was "an emergency regulation that must be issued immediately to correct an unsafe condition in aircraft."  Approximately 100 Model 45 aircraft were grounded from all flight operations as a result of the March 2003 airworthiness directive.

The March 2003 airworthiness directive stated that investigation of the incident "revealed that the acme screw of the horizontal stabilizer actuator

assembly was fractured. . . .  Structural failure of the horizontal stabilizer actuator

assembly could result in possible loss of control of the airplane."  It also stated that

it was issued because "the unsafe condition described is likely to exist or develop

on other airplanes."

As a result of the FAA's directive, -001 HSTAAs were modified to -005

HSTAAs and then placed into Model 45s between March 22, 2003 and April 8,

2003.  MPC manufactured and Learjet accepted delivery of more than one hundred

-005 HSTAAs in late March and early April 2003 in order to replace the existing

-001 HSTAAs and to get all Model 45s flying again.

In April 2003, the National Transportation Safety Board initiated its

investigation of the March 2003 Singapore incident.  During this investigation,

MPC disclosed[9] that there had been an unauthorized change in its manufacturing

processes, in December of 2001 or shortly after, wherein MPC used a then-

unapproved, in-house gas nitriding process to case harden HSTAA acme screws

instead of the liquid nitriding process called for on the HSTAA drawings.  The

Model 45 involved in the March 2003 incident had an HSTAA acme screw that

was manufactured in October 2001 and case hardened by the approved process,

_____

[9]  Learjet does not believe that MPC affirmatively disclosed the violations.
Regardless, this was learned during investigation of the March 2003 incident.

18

liquid nitriding.  However, the unapproved process change became an issue in the

FAA's ongoing review of the -005 HSTAA.  In addition, during the investigation it

was discovered that MPC was using 410 stainless steel ("410SS") in the

production of its HSTAA.  According to the FAA, the 410SS material on the acme

screw and nut was not compliant because sufficient data was not available for the

material.

Initially, Learjet and MPC agreed and argued to the FAA that the -005

HSTAA was the solution to the problem experienced in the March 2003 incident.

On August 13, 2003, however, the FAA issued a second emergency airworthiness

directive applicable to all Model 45 aircraft, including those with part numbers

-001 and -005, and grounded the entire Model 45 fleet.  The August 2003

emergency airworthiness directive acknowledged that MPC had developed the

-005 HSTAA and that -005 units were now installed on all Model 45s, as required

by the March 2003 airworthiness directive.  The FAA stated, in part, however:

> Although the HSTAA having P/N-005 is an improvement
> over P/N-001, it was not manufactured per the type design
> data.  A brittle fracture could occur on the acme screw and
> nut within the assembly having P/N-005, similar to that on
> the assembly having P/N-001.  During our investigation of
> this problem, we determined that the configuration and
> quality controls over the production of these parts were so
> deficient that we do not have confidence that the airplane
> can be operated safely for any period of time.

19

The August 2003 airworthiness directive also stated that it:

> requires replacement of the horizontal stabilizer actuator
> assembly (HSAA) with a new HSAA.   This action is
> necessary to prevent structural failure of the HSAA, which
> could result in possible loss of control of the airplane.  This
> action is intended to address the identified unsafe condition.

MPC contends that by mid-August 2003, it and Learjet concurred with the FAA

that a re-design and material change would be made.

The reasons for the FAA's second grounding of Model 45s included: the use

of 410SS material at all, the quality control (or lack thereof) by MPC, the

brittleness of the material at low temperature, the out-of-control processes at MPC,

the undocumented manufacturing changes by MPC, and the fact that unapproved

parts were flying on Model 45s.  MPC contends that the directive was the result of

the FAAs lack of familiarity with 410SS.  Plaintiffs respond, however, that it was

not just the FAA's lack of experience with or knowledge about 410SS that caused

the August 2003 grounding.

As a result of the August 2003 directive, a -007 HSTAA was developed.

Learjet and MPC agreed to use 4340 stainless steel in place of the 410SS in the -

007 HSTAAs.  Between August and the end of September 2003, Learjet obtained

FAA certification for a -007 HSTAA unit.  This was approved by the FAA and,

between August 13, 2003 and the end of September or early October, 2003, the

grounded Model 45s were retrofit to the -007 version HSTAA, which contained

in-house nitrided 4340 acme screws,

Approximately 235 Model 45s suffered complete and continuous withdrawal

from all flight operations as a result of the August 2003 airworthiness directive.

The last grounded aircraft was not able to resume flight operations until October

2003, at least seven weeks after the FAA issued the August 2003 airworthiness

directive.  Of the approximately 235 Model 45s worldwide that were grounded as a

result of the August 2003 emergency airworthiness directive, 23 were in the Flexjet

fleet.

## F.  MPC's Manufacturing Methods

In 1996, MPC approved the purchase of a used gas nitriding furnace, which

was then purchased in 1997 and installed in 1998.  By 1999, MPC was producing

production parts using gas nitriding without having obtained internal or external

approval for the gas nitriding process.

Keun Yun is a trained metallurgist hired by MPC in 1997 to set up the

nitriding furnace equipment MPC purchased.  In 2000, Yun reported to Craig

Scott.  Also involved in the manufacturing processes of MPC at that time were

Dave Heldt, supervisor of manufacturing engineering, engineer John Ivy (who

reported to Heldt), Tim Miniscalco, supervisor of manufacturing, and technician

Frank Muccianti (who reported to Miniscalco).  Yun, Miniscalco and Muccianti gave testimony through depositions.

Yun understood that no one was to make a production part without an approved "Engineering Instruction."  He understands there was never an engineering instruction issued and approved for gas nitriding before the March 2003 incident.  Yun claims that between 2001 and the March 2003 incident he had no knowledge that anyone was using the gas nitriding furnace system to produce production parts.  He never asked Muccianti why Muccianti was producing production parts, but Muccianti did tell Yun that someone had given him permission to do so.

Muccianti was hired by MPC in April 1999 as a technical supervisor involved with the heat treating lab and gas nitriding furnace.  He initially reported to Yun but later reported to Miniscalco.  When Muccianti started, he and Yun and the heat treating group were manufacturing production parts using gas nitriding, although not Model 45 HSTAA acme screws and nuts initially.  Muccianti can't remember specifically when they started doing the Model 45 HSTAA acme screws and nuts by gas nitriding.  He claims not to know who made the decision to start gas nitriding Model 45 HSTAA parts, but stated it wasn't a "big thing" because they were already doing other production parts.  Either he or Yun would have

22

checked the Learjet parts after the nitriding.

Muccianti knew there was no engineering instruction for gas nitriding.  He knows other people at MPC knew Learjet screws and nuts were being gas nitrided for production.  He had discussions with his supervisor, Miniscalco, about getting production done faster by doing gas nitriding in-house instead of liquid nitriding with outside vendors.  Muccianti's employee performance evaluation depended, in part, on how many different parts he could run through the gas nitriding system.

Before the groundings, Muccianti understood that MPC's engineers were working to get the in-house gas nitriding system documented.  However, he case hardened acme screws with the in-house gas nitriding process and assumed the parts were processed for sale.  Notwithstanding, he testified he did not know how the gas nitrided parts were actually used and denied knowing that any of the gas-nitrided parts got into the field.  He felt everyone knew what he was doing.  He felt the in-house gas nitriding process produced the same result as the liquid nitriding process and tested slugs processed with the acme screw and nuts to confirm this to his satisfaction.  Muccianti's basic assumption was that these gas nitrided components were being placed on aircraft.

Muccianti was told by his supervisor , Miniscalco, to write "in-house" on the piece part operations procedure sheet to record that the part was case hardened by

gas nitriding as opposed to liquid nitriding.  Muccianti generally so distinguished gas from the liquid nitriding on the piece part operations procedure sheet.  MPC admitted to the FAA that unapproved gas nitrided components were actually placed on dozens of Model 45 aircraft.  MPC was shipping and selling unapproved, gas nitrided parts for the Model 45.

Miniscalco has worked in the manufacturing portion of MPC's business for twenty-nine years and as of February 2007 was the manager of linear actuators. Between 2001 and 2005 he worked for and reported to Dale Sylvan, who was vice president of manufacturing for MPC.  Miniscalco learned that MPC was gas nitriding production parts in 2001, knew that the parts were being placed into inventory, and assumed, but did not know, that the parts were intended to be eventually installed on customers' aircraft.  However, Miniscalco first learned HSTAA were shipped with gas nitrided acme screws and nuts in May 2003. Miniscalco started his involvement with the gas nitriding process in 2002, when he was asked to "get in there, start doing a bunch of tests, and get analysis done and keep logs and all those kinds of things."  Sylvan assigned Miniscalco to oversee the in-house nitriding process.  There was no released engineering instruction for the in-house gas nitriding process when Miniscalco assumed that responsibility, and he made numerous unsuccessful efforts to get an engineering instruction

before March 2003.

Miniscalco knew Muccianti was gas nitriding parts that would eventually reach the MPC inventory and, ultimately, the customer.  Others within MPC who knew this included Yun, Dave Heldt, John Ivy, Joe Gondek and Sylvan. Miniscalco knew Muccianti's personal employment performance goal was to see how many more new MPC part numbers he could put in the gas nitriding process, a goal that came from Muccianti's suggestion.  Muccianti's personal "grip" goal was based on his own record-keeping and, if reached, could entitle him to a bonus at year-end equal to 3% of his annual salary.  Muccianti kept records of his attempts to reach his performance goal from July 27, 1999 through June 17, 2002, when his records indicate the goal was "stopped."  Muccianti never received any training in how he was supposed to use an engineering instruction, nor did he receive any training on Federal Air Regulations or MPC's quality control processes.  He never heard anything from MPC about ensuring that parts were manufactured to FAA regulations; he was never concerned about that.  Muccianti was laid off by MPC in July 2005.  Management at MPC has claimed that Muccianti was producing gas nitrided parts on his own and accused Muccianti of lying.

Miniscalco knew there was no approved engineering instruction for gas nitriding of Model 45 or other MPC parts before March 2003.  He knew MPC had

started the necessary process to try to write an engineering instruction and go

through the approval steps, but it was not getting done.  He knew that gas nitriding

of parts without a release engineering instruction would not happen, and he

therefore "elevated" that discussion on "numerous" occasions to Sylvan.

Miniscalco stated there was "constant dialogue going on to get this thing wrapped

up and done" or MPC would otherwise "just shut the thing down."

Miniscalco also knew that a change to gas nitriding from liquid nitriding

would require notification of all customers (not just Learjet) who had parts made of

410SS, "because you're changing something that has probably been qualified" by

the FAA.  One of the apparent impediments to getting an engineering instruction

approved was MPC's concern that it would have to notify all customers on

thousands of different parts.  Miniscalco acknowledged that an MPC customer

would have no way of knowing whether or not the manufacturing processes called

out on the drawings were actually applied to that component.  All the customer

would know is that the MPC "Certificate of Compliance" accompanying the part

stated the part met requirements.

Before March 2003, Miniscalco was not involved in any discussions

regarding the FAA requirements for such a process change, nor did he make any

personal evaluation of the Federal Aviation Regulations relating to the change.

26

Miniscalco was not involved in any meetings where the Learjet contract quality control obligations on MPC were discussed, nor was he involved in any discussion or training regarding MPC's quality control procedures relating to this change. After the March 2003 incident, Miniscalco and others felt like the change in manufacturing processes could be a problem but the company was "close-lipped" about the incident. Miniscalco felt pressure to again "elevate" his information to Sylvan to remind management that he had not been out running on his own as a "loose cannon."

Sylvan has worked for MPC since 1982. In 1996, Sylvan became vice president of rotary actuation systems and custom products for MPC. In 1999, he became vice president of operations. In that role, manufacturing reported to him, and he learned in 1999 that manufacturing was "doing a lot of testing" on the gas nitriding furnace. Sylvan knew the gas nitriding procedure was fundamentally different from liquid nitriding procedure that had been approved through Learjet by the FAA. He could not find any record of that change being communicated to Learjet or the FAA. Sylvan has seen nothing to suggest to him that either the FAA or Learjet had knowledge that MPC changed the manufacturing process.

People in MPC's quality department were aware that MPC was experimenting with in-house gas nitriding, but no one in the department was aware

that the unapproved process was used to case harden acme screws and nuts in fielded HSTAAs until after the first Model 45 grounding in March 2003. According to quality's Jim Harman, either Yun and/or Muccianti lied to him by telling him they were not producing production parts when in fact they were. The MPC quality department was involved with the gas nitriding and the calibration process as early as 1999 or 2000. After the March 2003 incident, the quality department learned that acme screws for the Model 45 HSTAA had been produced for over a year without an approved and released engineering instruction.

Each HSTAA was shipped with a certificate of conformity that the part met the requirements, specifications and/or drawings of the HSTAA called out in the purchase order. The certificates of conformity were signed by MPC's quality department employees. The quality department employees that completed the certificates of conformity reviewed and relied upon the HSTAA assembly level operations procedure sheet that followed the part, which was filled out and updated by manufacturing during each stage of the part's assembly and testing. However, the quality employees did not review the piece part level operations procedure sheets. Piece part level operations procedure sheets followed each piece part until that part was placed into inventory. At that point, piece part level operations procedure sheets were filed by the quality department, but not routinely reviewed.

The certification documentation on which Learjet and FAA relied to certify the Model 45 as an airworthy type design in 1997 included an engineering instruction that exclusively referred to specifications and manufacturing instructions for liquid nitriding of 410SS components, not gas nitriding of 410SS components. In conjunction with the sale and shipment of every HSTAA from MPC to Learjet, beginning with certification of the Model 45 through May 2003, MPC was required to assure conformance with the drawing and processes upon which the Learjet and the FAA had relied in certifying the Model 45 aircraft. Each unit was accompanied by written documentation certifying conformity to the Model 45 certification record, thus making a written representation that each and every HSTAA unit was manufactured using liquid nitriding. It is uncontroverted, however, that in December 2001, MPC started manufacturing Model 45 HSTAA units using gas nitriding. The manufacturing change was unknown to Learjet or the FAA until May 2003.

MPC was already manufacturing other parts using gas nitriding at the time it began negotiations with Learjet on the 2001 contract, and continued to use the unapproved gas nitriding process on other parts at the same time it was negotiating with Learjet for the 2001 contract. That contract was based on the same material and manufacturing process as the 1994 contract. A change in manufacturing to an

unapproved, untested, and uncertified process was never suggested by MPC to Learjet.

From the time MPC changed to gas nitriding until at least May 2003, MPC continued to ship with every HSTAA unit a certificate of compliance that was false. The certificate of compliance represents to Learjet and the FAA that the HSTAA unit had been manufactured in compliance with the type design certificate issued by the FAA (which was based on liquid nitriding, not gas nitriding) and with all contractual specifications. The certificate of compliance is signed off on by MPC quality personnel to signify that all the parts met their drawings.

As a result of the manufacturing change, in August 2003 the FAA learned and made findings that the HSTAA units were not manufactured pursuant to type design certification and that MPC's manufacturing processes were so flawed that it had "no confidence" that the Model 45 could operate safely using the MPC HSTAA. The consequences of these findings, including the finding of an unsafe condition, was the mandatory emergency airworthiness directive grounding the entire Model 45 fleet in August 2003.

When the 1994 contracts between Learjet and MPC were signed, MPC had a quality compliance procedure in place that complied with applicable standards. In 1994-1995, MPC obtained a certification that its quality compliant procedures

were satisfactory.  Again in 2000, MPC quality procedures were certified as compliant and following that, in 2001-2002, the procedures were certified as compliant when a new standard was developed in the industry.  These standardized procedures attempt to provide uniformity in required quality systems, including documentation required by the quality system.

At all times, MPC's normal document control and drawing procedures required manufacture of a part to the requirements, specifications and/or drawings called on purchase orders or documentation of any known variance therefrom.  The required documentation includes how the manufacturer documents its inspections, construction, ordering, shipping and everything between.  Practices and policies of the MPC quality system were compared with any customer quality requirements in an attempt to confirm that they satisfied the customer's requirements.  MPC used periodic quality audits by its quality department for the procedure to check that the correct processes were employed during manufacture.  Such audits are intended to eventually disclose any use of unauthorized manufacturing process.

MPC did not comply with those procedures nor did it comply with the Learjet quality control processes which it was contractually obligated to follow and which MPC represented in negotiations it would follow.  This procedure was never implemented on the Model 45 HSTAA manufacturing process or any other use of

31

the new gas nitriding process before the March 2003 incident.  In fact, MPC's

quality control department expressed "shock" when it was told after the March

2003 incident that a major manufacturing process changed had occurred.

According to MPC's quality control personnel, the change in manufacturing for the

Model 45 HSTAA occurred in December 2001.

## G.  Provision of "Interim Lift"

Learjet's damages claim includes a demand for reimbursement of its

"interim lift" payments.   As a result of the loss of use of Model 45s during the

mandatory FAA groundings, Learjet provided alternative transportation options to

its individual and business customers who owned Model 45 aircraft, generally

termed interim lift coverage.  MPC's director of sales and marketing, Kevin

Sprouse, testified that MPC was aware that Learjet was providing alternate lift to

its operators of Model 45s.

Plaintiff's expert opined that the provision of interim lift is a common

practice in the business jet industry.  It is handled on a case-by-case basis, usually

without any written policy.  Plaintiff's expert further opined that interim lift is a

necessary customer support tool used in the business jet industry since the first

days of business jets.  It is used to support customers who have been grounded due

to circumstances under the control of the manufacturer.  Interim lift coverage is not

intended to be a "free ride" for the beneficiary.  In effect, the beneficiary is expected to pay for the things it would be responsible for if it had used its own plane for the trip, and the manufacturer would pick up the rest.  The duration of a grounding is a heavily weighted factor in the decision to provide interim lift coverage.  The expected duration drives the decision to provide interim lift, along with a test of reasonableness, considering the particular circumstances facing the customer.

Following the March 2003 grounding, Learjet communicated to its customers that it "fully appreciates the great potential for disruption to your operation and to your business during your aircraft downtime.  However, we do not have sufficient assets at our disposal to interim lease aircraft to the many affected operators."  Following the August 2003 grounding, Learjet communicated to its customers that it "sincerely regret[s] the great potential for disruption to your operation and to your business during your aircraft downtown [sic]. Therefore, after reviewing the current status and timeline of the certification effort and evaluating input received from customers, we have made the decision to enhance our interim lift policy to better support you."

One of Learjet's experts, Charles Suma, opined that the efforts of the Learjet team in developing and instituting its customer care program were justified based

33

on the financial investment made by the company in the product line, the financial

impact of the grounding to its customer base, and the real threat of losing existing

and potential customers for the five to seven year sales cycle.  Suma opined that if

Learjet did not handle the groundings in a way that was expeditious and acceptable

to its customers, the grounding and its negative effect on the customers would have

significantly impacted Learjet's future sales volumes, triggering a serious financial

impact to Learjet and its suppliers.[10]

Within days of the March 2003 grounding, Learjet notified MPC via letter to

Kevin Sprouse that Learjet had undertaken a program to capture all costs

associated with the deficient HSTAAs.  The letter stated that MPC's liability for

---

[10]  Suma further opined that the scope, detail, mechanical basis, and depth of the
Learjet's interim lift program was fair and reasonable in application and execution and
that it was executed with the long-term interest of Learjet, its customers, and suppliers in
mind.  Suma opined that although this type of FAA-mandated grounding is rare, the type
of customer care program used in this situation is not, and actually is commonly used to
support customers affected by a grounding of this type.  Finally, Suma opined that the
program scope, structure and depth follow the same basic pattern as other customer care
programs instituted by aircraft manufacturers to support aircraft owners in similar FAA
aircraft groundings.
    Another of Learjet's experts, Peter Ginocchio, opined that Learjet's provision of
interim lift in connection with the two FAA groundings was necessary and in keeping
with industry practice.  Ginocchio further opined that neither of the interim lift programs
went beyond industry practice; interim lift was essential to minimize the upset to
customer operations during both groundings and was the only solution available to
Learjet to meet its customers' expectations.
    Learjet's final expert regarding interim lift, Bradley Preber, opined that Learjet's
damages for interim lift expenses totals $8,076,253.  Of that amount, $78,675 stems from
the March 2003 grounding, the remainder stemming from the August 2003 grounding.

the issue was clear, that responsibility of these matters must be assumed by MPC, and that it was Learjet's intention to submit its costs to MPC for payment.

The purchase agreements between Learjet and its customers concerning the Model 45 describe Learjet's warranties to its customers. The purchase agreements state the agreement between those parties for each Model 45 sold by Learjet up to the second grounding in August/September of 2003. The payment of interim lift charges is not promised under the warranty which Learjet provides to its customers. The interim lift policies were created by Learjet/Bombardier customer support to reimburse its "customers" and facilitate their travel during the groundings by paying a charter sum less what a Model 45 would cost to operate based upon usage rates.

## H.  Learjet's Fraud Claim

In addition to its claims based on breach of contract and breach of warranty, Learjet contends the following are fraudulent misrepresentations made by MPC:[11]

1.    MPC was and would continue to be a qualified and quality manufacturer with sufficient expertise and experience to design, manufacture, supply and service the HSTAA for the Model 45;

2.    MPC would design, test, and manufacture HSTAA using processes

---

[11]  Items 1-9 below are taken from the proposed pretrial order (Doc. 142, Ex. E at 14-15); items 10-13 are taken from Learjet's interrogatory answers.  (Doc. 153, Ex. N at ¶ 44.)

and quality control procedures standard in the industry and fully compliant with the standards established by Learjet and by the FAA;

3.    MPC would select materials for the Model 45 HSTAA that were appropriate for and capable of serviceable use in flight conditions;

4.    MPC would establish manufacturing processes sufficient to meet the reasonably anticipated needs of Learjet in supplying HSTAA units for production and in the field;

5.    MPC would comply with and subsequently was complying with all laws, regulations, mandates and other requirements of the FAA;

6.    MPC would comply with and subsequently was complying with all rules, regulations, standards, and other requirements of Learjet;

7.    MPC would manufacture and subsequently was manufacturing HSTAA components parts in accordance with the airworthiness certification of the Model 45 established by the FAA;

8.    MPC would adequately and accurately document and subsequently was adequately and accurately documenting the design, testing, and manufacturing of the Model 45 HSTAA components using a chemical process known as "liquid nitriding" to harden the surface of certain steel surfaces so as to comply with the design, manufacturing, service and reliability standards established by Learjet and the FAA;

9.    MPC would communicate and subsequently was communicating to Learjet all material changes in its design, manufacturing, or service process as to the Model 45 HSTAA components, including but not limited to changes relating to FAA certification rules and regulations;

10.   Regarding the Learjet RFP, MPC submitted written and verbal responses which contained multiple statements of fact regarding MPC's competence, capabilities, technical expertise, experience, design abilities, performance guarantees, and compliance guarantees. At the time of those written and verbal representations, MPC had not designed, certified or manufactured a horizontal stabilizer actuator

36

assembly

11.    MPC chose 410SS for the HSTAA components, a steel with which
Learjet was largely unfamiliar and with which MPC was fully
familiar.  MPC, via Darrin Kopala, represented and persuaded Learjet
and the FAA that 410SS was and would be a suitable material for the
HSTAA primary component, without MPC having any experience
utilizing 410SS in such a primary flight control system or
environment.  MPC further represented that 410SS was suitable and
appropriate for use in the Model 45 HSTAA and that MPC had in
place and would implement and use a specific chemical process for
surface hardening the 410SS.  MPC specifically represented and set
forth a particularized material treatment process for rendering the
410SS safe and appropriate for the MPC design.

12.    MPC represented to Learjet and the FAA, through an individual
certificate of compliance, that every HSTAA unit shipped was
manufactured in conformity with the then-existing FAA certification.
For a period of approximately 15 months (approximately December
2001 into at least May 2003), MPC violated that representation by
shipping product that was not manufactured according to the certified
design and manufacturing drawings or applicable quality control
requirements.

13.    MPC represented to Learjet and the FAA that a quality control process
would be and was put in place to ensure specific and individualized
tracking and manufacturing control for each component part, thereby
ensuring manufacture to FAA certification.  MPC violated that
representation by failing to maintain manufacturing process controls
and by not creating and maintaining documentation of component
hardware.

## I.  MPC's Counterclaim

MPC has asserted a counterclaim against Learjet and claims three separate

categories of damages:

1.     $466,800, and an additional $2825 increase of per unit cost per
       HSTAA, for design and engineering services MPC performed under
       the 1994 contract on the -001 HSTAA;

2.     $522,725 for -005 HSTAAs that replaced -001 units following the
       March 2003 grounding ($5075 for every -001 HSTAA that was
       overhauled and upgraded to a -005 HSTAA); and

3.     $4,667,500 or approximately $1,710,855 (19,009.5 hours at the
       indexed $90/hour) for design and engineering services MPC
       performed under the 2001 contract relating to the development of the
       -007 HSTAAs.

Regarding the first category of claimed damages, MPC states that on April

22, 1996, it wrote a letter to Learjet demanding reimbursement for expenses it

incurred between 1994 and 1996 in the development of the -001 HSTAA.  These

changes totaled $466,800 (nonrecurring) and $2825 for each HSTAA.  Learjet

responded that it was not going to pay those costs.  MPC claimed that based on

Article 6 (regarding modifications and changes) of the 1994 contract it "was due

reimbursement of its costs to alter and develop the HSTAA design and/or payment

of its other increased costs associated with the changes from Learjet."

Regarding the second category of claimed damages, MPC claims that in the

fall of 2001, "MPC and Learjet agreed to a price of $5075/each HSTAA to modify

existing -001 HSTAA to the newer version, the -005 HSTAA.  The agreement to

this price was a negotiated settlement."  MPC claims damages of $522,725, and

prejudgment interest, for Learjet's failure to pay for retrofits from the -001 to the

38

-005 version of the HSTAA.  MPC claims that 118 HSTAAs were modified

between March 22, 2003 and April 8, 2003.  MPC claims that Learjet has "refused

and refuses to pay MPC additional compensation under the quoted contract

provision."

Finally, regarding the third category of claimed damages, MPC claims it is

entitled to recover $4,667,500, or approximately $1,710,855 (19,009.5 hours at the

indexed $90/hour), and pre-judgment interest, because under the parties' contracts,

the -007 HSTAA was a performance improvement and/or provided economic

benefit to operators, and, therefore, MPC should be reimbursed for the -007

HSTAAs' development.[12]

### III.  SUMMARY JUDGMENT STANDARDS

As previously stated, this matter is currently before the Court on motions for

summary judgment.  The usual and primary purpose "of the summary judgment

rule is to isolate and dispose of factually unsupported claims or defenses."  Celotex

Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The Federal Rules of Civil

Procedure direct the entry of summary judgment in favor of a party who "show[s]

that there is no genuine issue as to any material fact and that the moving party is

---

[12]  Again, there are several provisions in the parties' 2001 contract that are
pertinent to MPC's counterclaim.  However, rather than quote the 2001 contract at length
here, the Court will quote the relevant portions in its analysis.

entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is

"genuine" if sufficient evidence exists on each side "so that a rational trier of fact

could resolve the issue either way" and "[a]n issue is 'material' if under the

substantive law it is essential to the proper disposition of the claim."  Adler v. Wal-

Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citations omitted).

The moving party initially must show both an absence of a genuine issue of

material fact, as well as entitlement to judgment as a matter of law.  See id. at 670.

The nature of the showing depends upon whether the movant bears the burden of

proof at trial with the particular claim or defense at issue in the motion.  If the

nonmoving party bears the burden of proof, the movant need not "support its

motion with affidavits or other similar materials negating the opponent's" claims

or defenses.  Celotex, 477 U.S. at 323.  Rather, the movant can satisfy its

obligation simply by pointing out the absence of evidence on an essential element

of the nonmovant's claim.  Adler, 144 F.3d at 671 (citing Celotex, 477 U.S. at

325).  On the other hand, if the movant has the burden of proof on a claim or

defense raised in a summary judgment motion, it must show that the undisputed

facts establish every element of the claim or defense.  See, e.g., United States v.

Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc).

The moving party properly supports its motion, the burden shifts to the

nonmoving party, "who may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Muck v. United States, 3 F.3d 1378, 1380 (10th Cir. 1993).  In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." Adler, 144 F.3d at 671.  If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 533 (10th Cir. 1994).  A party opposing summary judgment "cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 793 (10th Cir. 1988).  Put simply, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

Certain rules govern the presentation of facts and evidence in relation to the summary judgment procedure.  Local Rule 56.1 requires the movant to set forth a concise statement of material facts.  D. Kan. Rule 56.1.  In addition, "[a]ll material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of

the opposing party." Id.

The parties need not present evidence "in a form that would be admissible at trial, but the content or substance of the evidence must be admissible.  For example, hearsay testimony that would be inadmissible at trial may not be included . . . ." Thomas v. Int'l Bus. Machines, 48 F.3d 478, 485 (10th Cir. 1995) (internal quotations and citations omitted).  Similarly, the Court will disregard conclusory statements and statements not based on personal knowledge.  Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1382 (10th Cir. 1994) (regarding conclusory statements); Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995) (requiring personal knowledge).  Last, the Court may disregard facts supported only by references to documents unless the parties have stipulated to the admissibility of the documents or the documents have been authenticated by and attached to an affidavit meeting the requirements of Rule 56(e).  Fed. R. Civ. P. 56(e); D. Kan. Rule 56.1.

In the end, when confronted with a fully briefed motion for summary judgment, the Court must determine "whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  Accordingly,

the Court must review the "factual record and reasonable inferences therefrom in the light most favorable to the nonmoving/opposing party." <u>Kidd v. Taos Ski Valley, Inc.</u>, 88 F.3d 848, 851 (10th Cir. 1996); <u>Anderson</u>, 477 U.S. at 255.  If sufficient evidence exists on which a trier of fact could reasonably find for the non-moving party, summary judgment is inappropriate. <u>Prenalta Corp. v. Colorado Interstate Gas Co.</u>, 944 F.2d 677, 684 (10th Cir. 1991).

## IV.  DISCUSSION

For ease of consideration, the Court will separately address each summary judgment motion now under consideration.

### A.  Flexjet's Claims for Breach of Express Warranties and Breach of Implied Warranties

MPC moves for summary judgment on all Flexjet's claims against it (<u>i.e.</u>, breach of express warranties and breach of implied warranties).  (Doc. 135.)  MPC first alleges that Flexjet's claims fail because Flexjet is not in privity of contract with MPC.  MPC alternatively argues that Flexjet's damages are based on indemnity and fail because they do not fulfill the law of indemnity's requirement that a legal obligation existed to pay the sums that make up Flexjet's damages. (Doc. 136.)  Flexjet responds that privity of contract is not required for a successful claim of breach of express warranty and that, even if it is required, such privity exists under the 2001 contract between Learjet and MPC.  Flexjet then asserts that

43

privity of contract is not required for Flexjet's claim of breach of implied

warranties because the Model 45 is inherently dangerous.  Finally, Flexjet responds

that the indemnity principles relied upon by MPC are inapplicable.  (Doc. 150.)

MPC replies and "concedes Flexjet has raised a genuine issue of fact

concerning the first ground by presenting evidence that it purchased the Model 45

aircraft from Learjet.  MPC withdraws its first argument."  MPC has removed from

consideration its privity of contract grounds for summary judgment on Flexjet's

claims.  Therefore, the issue remaining for the Court's resolution is whether MPC

is entitled to summary judgment on Flexjet's claims because the claims fail under

indemnity principles.  (Doc. 162 at 1-2.)

Flexjet contends that it "seeks to recover direct, incidental and/or

consequential damages as permitted under the UCC" for its claims.  (Doc. 150 at

25.)  A claim for breach of express warranty arises under section 2-313 of the

Uniform Commercial Code ("UCC").[13]  See K.S.A. § 84-2-313 (defining an

---

[13]  No party disputes that the UCC applies to this case.  See K.S.A. § 84-2-102
(defining scope of UCC as applying to "transactions in goods").

In addition, no party disputes that Kansas law applies to the parties' dispute.  See
Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941) (stating that in
diversity of citizenship actions, a federal court should apply the choice of law rules of the
state in which it sits); Brenner v. Oppenheimer, 273 Kan. 525, 538, 44 P.3d 364, 374
(Kan. 2002) (stating that Kansas choice of law rules in contract-based actions "permit
parties to choose the law applicable to their agreement"); Pepsi-Cola Bottling Co. of
Pittsburg, Inc. v. PepsiCo, Inc., 431 F.3d 1241, 1255 (10th Cir. 2005) (stating that a
contracted choice of law provision controls all questions of law flowing from the parties'

express warranty as "[a]ny affirmation of fact or promise" or "[a]ny description of

the goods which is made part of the basis of the bargain" or "[a]ny sample or

model which is made part of the basis of the bargain").  Claims for breach of

implied warranty arise under sections 2-314 and 2-315 of the UCC.  <u>See</u> K.S.A. §

84-2-314 (implied warranty of merchantability); K.S.A. § 84-2-315 (implied

warranty of fitness for a particular purpose).

Section 2-714 provides for damages for breach of warranty under the UCC

and allows incidental and consequential damages "[i]n a proper case."  <u>See</u> K.S.A.

§ 84-2-714.  Flexjet cites the UCC's incidental and consequential damages section

as the basis for its damages claim.  <u>See</u> K.S.A. § 84-2-715.  That section provides:

> (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
>
> (2) Consequential damages resulting from the seller's breach include
>
>> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason

---

contract and any breach thereof).  Article 30 of the parties' 1994 contract and Article 22.1
of the 2001 contract state that the contracts are governed by Kansas law.

> to know and which could not reasonably be
> prevented by cover or otherwise; and
>
> (b) injury to person or property proximately
> resulting from any breach of warranty.

K.S.A. § 84-2-715.

MPC claims that regardless of the UCC, Flexjet has actually made a claim for indemnity because Flexjet's claims for damages fit the mold of a "traditional" indemnity claim.  MPC cites the following passage from the Kansas Supreme Court:

> There are two traditional situations in which claims of indemnity are allowed. The first occurs where there is an expressed contract of indemnity, such as a "hold harmless" agreement.  The second occurs where a contract of indemnity may be implied when one is compelled to pay what another party ought to pay.  The implied or constructive liability usually arises when one personally, without fault, is made to pay for a tortious act of another. The person paying has a right of action against the person at fault.

Haysville U.S.D. No. 261 v. GAF Corp., 233 Kan. 635, 642, 666 P.2d 192, 199 (Kan. 1983).  MPC then contends that because Flexjet allegedly cannot meet all the elements of a traditional indemnity claim, MPC is entitled to summary judgment on Flexjet's claims.  Flexjet's responds that, because it is bringing breach of warranty claims under the UCC and not an indemnity claim pursuant to Kansas common law, the elements necessary for an indemnity claim are not relevant.

46

(Doc. 150 at 25.)

The UCC does not require a duty to pay as a condition precedent to a claim for incidental and/or consequential damages.  The UCC requires only a test of reasonableness for incidental damages and that the seller had "reason to know" of the particular needs of the buyer at the time of sale for a claim for consequential damages.  K.S.A. §84-2-715.  However, the UCC supplements its provisions with general "principles of law and equity" unless those principles have been "displaced by the particular provisions" of the UCC.  K.S.A. § 84-1-103.  Section 84-1-103 lists several common law principles not displaced by the UCC, including "the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy or other validating or invalidating cause."

MPC argues that the common law indemnity rule must apply because it has not been "explicitly replaced by the UCC."  (Doc. 162 at 4.)  MPC then cites cases from other jurisdictions where the court has found that the common law indemnity rule has not been displaced by the UCC (and therefore determined that the indemnity rule applies to the case).  See, e.g., Adkinson v. Int'l Harvester Co., 975 F.2d 208, 212-15 (5th Cir. 1992) (applying Mississippi law); Coons v. A.F. Chapman Corp., 460 F. Supp. 2d 209, 225 (D. Mass. 2006) (applying

Massachusetts law); <u>Warner v. Reagan Buick, Inc.</u>, 483 N.W. 2d 764, 770-71

(Neb. 1992) (applying Nebraska law); <u>Maxfield v. Simmons</u>, 449 N.E. 2d 110,

111-112 (Ill. 1983) (applying Illinois law); <u>Wilson v. Dodge Trucks, Inc.</u>, 235 S.E.

2d 142, 143-44 (Ga. 1977) (applying Georgia law).  <u>See also</u> <u>Mellon Investor</u>

<u>Servs., LLC v. Longwood Country Garden Centers, Inc.</u>, No. 07-1140, 2008 WL

341705 (4th Cir. Feb. 6, 2008) (applying New Jersey law to determine that UCC

Article 8 does not displace a common law indemnity claim).

   The Court finds these cases persuasive.  In addition, Kansas courts have

previously stated that "the Uniform Commercial Code clearly does not affect

common-law doctrines unless it explicitly replaces them."  <u>Weidensaul v.</u>

<u>Greenhouse Restaurant of Lawrence, Inc.</u>, 13 Kan. App. 2d 95, 97, 762 P.2d 196,

197 (Kan. Ct. App. 1988) (finding that Kansas' common law of accord and

satisfaction was not abrogated by the UCC).  The <u>Weidensaul</u> court stated:

> The official UCC comment to 84-1-103 indicates that all
> supplemental bodies of law will continue to be applicable
> except insofar as they are explicitly displaced.  The Kansas
> comment emphasizes that general principles of law and
> equity must supplement the UCC and that the listing given
> in Section 84-1-103 is merely illustrative.  The Kansas
> comment lists other pre-Code and non-Code principles
> which have been recognized and used in cases under this
> section, including promissory estoppel, principal and agent,
> non-Code priority rules, suretyship, estoppel, rules of
> interpretation, and waiver.

Id.  The UCC does not "explicitly displace" the common law of indemnity;

therefore, common law indemnity principles must be applied.  See also Black v.

Don Schmid Motor, Inc., 232 Kan. 458, 473, 657 P.2d 517, 529 (Kan. 1983)

(applying "right of indemnity" to a UCC claim and stating that "a seller that is

liable for damages to a purchaser of defective goods may seek indemnity from the

manufacturer where the damages were the proximate result of the manufacturer's

breach of warranty").

    The case relied upon by MPC for the principles of law regarding indemnity,

however, GAF Corp., is not particularly applicable to the facts at hand.  In GAF

Corp., the plaintiff school district contracted with a roofing contractor for repair of

two building roofs.  The roofs, subsequent to repair, leaked and caused substantial

damage.  The school district sued defendant GAF Corp., who was the manufacturer

of products used in the roofing project, for breach of warranty under the UCC,

negligence, fraud, and breach of inspection and service guarantees that were made

between the school district and GAF Corp.  233 Kan. at 636-37, 666 P.2d at 195.

    Defendant GAF Corp. joined the architects, roofing contractor, and a

separate roof product manufacturer as third-party defendants, pursuant to K.S.A. §

60-214(a).  Id. at 637, 666 P.2d at 196.  Section 60-214(a) permits a defendant (i.e.,

the "third-party plaintiff") to join a party "who is or may be liable to the third-party

plaintiff for all or part of the plaintiff's claim against the third-party plaintiff."

K.S.A. § 60-214(a).

Defendant GAF Corp, therefore, explicitly alleged a claim for common law indemnity, and used the Kansas statute for its right to bring the action.  The Kansas Supreme Court ultimately concluded that if GAF Corp. did have a right of subrogation against the third-party defendants, that right would not accrue until GAF Corp. paid or was required to pay the plaintiff school district.  GAF Corp., 233 Kan. at 647, 666 P.2d at 203.

This, of course, is not the same procedural posture as the case at hand.  Here, two distinct plaintiffs bring claims for damages against one defendant stemming from breach of warranty under the UCC.  The plaintiffs do not contend their damages are somehow dependent on others, or that their claims for damages are based on common law principles, or that someone other than defendant is liable for their damages.

MPC tries to draw similarities between the cases by stating that Flexjet's damages accrued either pursuant to its management contracts with its customers or pursuant to its own voluntary provisions to its customers.  Therefore, MPC's argument goes, Flexjet "has no right to indemnity" because it, like the defendant in GAF Corp., did not have a duty to pay the sums.  This is not a tenable comparison,

50

however.  In <u>GAF Corp.</u>, the defendant was attempting to compare fault and had not yet been damaged.  Here, the fault is alleged against only MPC (<u>i.e.</u>, there is no fault "comparison"), and Flexjet's alleged damages have already been experienced.

Regardless, the Court finds that MPC's motion for summary judgment must be denied.  Applying the law of indemnity to the facts at hand, there is a factual issue whether Flexjet had "actual liability" under its sales contracts with Model 45 purchasers.  Under Flexjet's management agreements with these individuals and businesses, it had an obligation to "provid[e] business aircraft for the customer's transportation."  Under Flexjet's interchange agreements with these individuals and businesses, the individuals and businesses were "entitled" to use Flexjet's aircraft.  As a result, the Court cannot say that there is no genuine issue of material fact and that MPC is entitled to judgment as a matter of law.  See <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 670 (10th Cir. 1998).  MPC's motion on Flexjet's claims (Doc. 135) must be denied.

## B.  Learjet's Claim for Interim Lift Charges

MPC next moves for summary judgment on Learjet's claim for damages stemming from Learjet's provision of interim lift to Model 45 owners.  MPC contends that "Learjet is not entitled to indemnification of this expense because it was not 'actually liable' to the owners of the Model 45s for their 'interim lift'

51

expenses." (Doc. 138 at 2.)  MPC makes the same general argument of law

discussed immediately above: that Learjet has alleged an implied indemnity claim,

that success of such a claim requires proof of actual liability for the damages

claims, and that because Learjet voluntarily provided interim lift charges, it cannot

succeed with such a claim.  (Doc. 138 at 6-12.)

Learjet's response mirrors that of Flexjet's: that its claim originates from the

UCC's provision for incidental and consequential damages, and therefore no proof

of actual liability is required.  However, Learjet alternatively argues that if actual

liability is required to be shown, it has done so.  (Doc. 148-16.)

The Court finds that the same standards of law apply to this motion for

summary judgment as to MPC's motion regarding Flexjet.  In addition, the Court

must deny MPC's motion against Learjet for the same reason: genuine issues of

material fact remain regarding whether Learjet had "actual liability" for the interim

lift charges.  Learjet's experts characterized interim lift as common practice in the

business jet industry.  Learjet's experts also characterized interim lift programs as

being handled on a case-by-case basis without written policy.  One of plaintiff's

expert's Ginocchio, characterized interim lift as a "necessary customer support

tool."

However, it is also uncontroverted that interim lift was not "promised" under

52

Learjet's contracts and was done as a customer support mechanism.  Regardless

there is abundant expert opinion evidence that Learjet's provision of interim lift

was necessary and customary in the industry.  The UCC treats industry custom

with high deference.  See K.S.A. § 84-1-205(2) ("A usage of trade is any practice

or method of dealing having such regularity of observance in a place, vocation or

trade as to justify an expectation that it will be observed with respect to the

transaction in question.  The existence and scope of such a usage are to be proved

as facts.").  This convinces the Court that factual issues remain whether Learjet

was "actually liable" for the provision of interim lift and MPC's motion must be

denied.

        In addition, the Court is not convinced at this stage of the proceedings, and

without a definitive pretrial order,[14] that Learjet's damage claim which includes

interim lift charges may not be directly related to a claimed loss of good will or

business reputation by Learjet.  If so, those claims would be wholly independent of

any alleged "indemnity" damages resulting from potential claims by purchasers of

the Model 45 and the whole issue of "actual liability" would be inapplicable.

---

        [14]  The parties did submit a proposed pretrial order to the Court in September 2007,
but they acknowledged that it was not complete and that "a more final draft" was being
contemplated.  (Doc. 142, Ex. E.)  The briefing on these summary judgment motions then
proceeded without any final pretrial order.

Learjet's experts argue that the fleetwide grounding of the Model 45's by the FAA could have resulted in loss of future sales of this new "clean sheet" model, and thus a damage to Learjet's goodwill and business reputation.  The Tenth Circuit has recognized that damages can be recovered in appropriate cases for loss of good will and business reputation although proof of those damages may be difficult to ascertain or prove.  See  R.E.B. v. Ralston Purina, 525 F.2d 749, 752-53 (10th Cir. 1975) (noting that loss of good will and business reputation may be damages that flow naturally from the breach of a warranty);  Westric Battery Co. v. Standard Elec. Co., Inc., 522 F.2d 986, 987-88 (10th Cir. 1975) (citing cases allowing damages for loss of good will as a result of a breach of warranty involving a defective product);   American Multi-Cinema, Inc. v. Southroads L.L.C., 115 F. Supp.2d 1257, 1267-68 (D. Kan. 2000) (discussing sufficiency of evidence of loss of customers and good will in breach of contract case to withstand motion for summary judgment).  Faced with the possibility of severe damage to its good will or business reputation, Learjet's decision to provide interim lift to its customers may be considered to be its attempt to mitigate those potential damages to its reputation.  Whether such an action was reasonable mitigation or whether such damages are speculative in nature involve factual questions to be decided by

the jury.[15]

For all these reasons, MPC's motion regarding Learjet's interim lift damages is denied.

### C.  Learjet's Claim for Fraud and Punitive Damages

MPC next moves for summary judgment on Learjet's fraud claim, alleging that "there is no evidence to support a claim MPC made untrue statements of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, and upon which another party justifiably relied and acted to his or her detriment.  Instead, the uncontroverted facts show Learjet's claims in this case sound only in contract."  (Doc. 140 at 2.)  MPC argues that Learjet's allegations of fraud "boil down to mere claims of breach of contract."

Learjet's most recent amended complaint alleges only the fraud theories of false <u>representations</u> as to statements of material facts and false <u>representations</u> as to promises of future events.  (Doc. 41 at 21-28.)  Learjet's response to MPC's motion attempts to allege a third fraud theory: fraud by <u>silence</u>.[16]  The court will

---

[15]  MPC clearly contemplates this potential damage claim to Learjet's and Flexjet's good will, Doc. 163 at 9 n. 8, but then argues that Kansas courts would find such a claim too speculative.  MPC cites no Kansas authority to support this argument and the above cases indicate that such damages claims can survive summary judgment.

[16]  Learjet also set out its theory of fraud by silence in the proposed pretrial order, but MPC objected to inclusion of such a claim.  (Doc. 142, Ex. E at 33.)

treat MPC's response as an attempt to amend the pleadings.  See Martinez v.

Potter, 347 F.3d 1208, 1211 (10th Cir. 2003) (stating that Tenth Circuit cases

"interpret the inclusion of new allegations in a response to a motion for summary

judgment as a potential request to amend the complaint" pursuant to Fed. R. Civ. P.

15).

The amendment of a complaint upon objection by the opposing party is

within the discretion of the Court.  Las Vegas Ice & Cold Storage Co. v. Far West

Bank, 893 F.2d 1182, 1184-85 (10th Cir. 1990).  "Several factors are typically

considered by the courts in determining whether to allow amendment of a

complaint.  'These include whether the amendment will result in undue prejudice,

whether the request was unduly and inexplicably delayed, was offered in good

faith, or that the party had sufficient opportunity to state a claim and failed.  Where

the party seeking amendment knows or should have known of the facts upon which

the proposed amendment is based but fails to include them in the original

complaint, the motion to amend is subject to denial.'"  Las Vegas Ice & Cold

Storage Co., 893 F.2d at 1185; see also McNulty v. Sandoval County, No. 06-

2121, 107 Fed. Appx. 770, 775-76 (10th Cir. Mar. 27, 2007) (citing and quoting

Las Vegas Ice & Cold Storage Co.).  In addition, "[u]ntimeliness alone may be a

sufficient basis for denial of leave to amend" and "prejudice to the opposing party

need not also be shown." <u>Las Vegas Ice & Cold Storage Co.</u>, 893 F.2d at 1185.

Amendment of the pleadings in this case will not be permitted.  If the Court were to allow amendment, a new round of summary judgment motions would have to be permitted.  The deadline for such motions has already passed, the Court would have to reopen the deadline for such motions, and this would delay resolution of this case.  The case has already been languishing for some time: it was filed in March 2005, three years ago, and Learjet did not attempt to assert this fraud by silence theory until the present time, more than two years after Learjet's most recently filed amended complaint.  Learjet has offered no justification for its failure to amend at an earlier date.

The Court will analyze Learjet's two properly pled fraud theories.

## 1.  False Representations as to Statements of Material Facts

Learjet's first fraud theory is that MPC made false representations as to statements of material facts.  An action for fraud must involve an untrue statement of material fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, and upon which another party justifiably relies to his or her detriment.  <u>Alires v. McGehee</u>, 277 Kan. 398, 403, 85 P.3d 1191, 1195 (Kan. 2004); Kan. PIK 4th Civil § 127.40.  Fraud must be proven by clear and convincing evidence.  <u>Waxse v. Reserve Life Ins. Co.</u>, 248 Kan. 582,

586, 809 P.2d 533, 536 (Kan. 1991).  "The existence of fraud is normally a question of fact."  Id.

"To constitute fraud, a representation must relate to past or present facts, as opposed to statements as to matters of opinion, puffing, or promised actions in the future."  Timi v. Prescott State Bank, 220 Kan. 377, 389,  553 P.2d 315, 325 (Kan. 1976).  The alleged misrepresentations "need not be the sole cause of the plaintiff's conduct which results in his injury" and it is "sufficient if the fraudulent misrepresentations were part of the moving cause, and, absent those misrepresentations, plaintiff would not have acted to his detriment."  Slaymaker v. Westgate State Bank, 241 Kan. 525, 532, 739 P.2d 444, 450 (Kan. 1987).  A fact is material if it "is one to which a reasonable person would attach importance in determining his choice of action in the transaction involved."  Timi, 220 Kan. at 389, 553 P.2d at 325.

## 2.  False Representations as to Promises of Future Events

Learjet's second fraud theory is that MPC made false representations as to promises of future events.  An action for fraud as to misrepresentations of promises of future events requires that: the promisor had no intention of performing its promise at the time it was made, the promisor did not perform its promise as it represented that it would, the promisor made the promise with the intent to deceive

and for the purpose of inducing the plaintiff to act upon the promise, the plaintiff reasonably relied and acted upon the promise and sustained damages as a result of relying upon the promise of the promisor.  Edwards v. Phillips Petroleum Co., 187 Kan. 656, 660, 360 P.2d 23, 27 (Kan. 1961) ("A promise to do something in the future, by which the promisor obtained something of value, if the promisor had no intention of performing his promise at the time he made it, amounts to deceit and actionable fraud."); Kan. PIK 4th Civil § 127.42.

"If there are circumstances tending to show an actual fraudulent intent at the time the promise or representation regarding a future event is made, fraud may be predicated thereon, notwithstanding the future nature of the representations." Edwards v. Phillips Petroleum Co., 187 Kan. 656, 660, 360 P.2d 23, 26 (Kan. 1961).  "[A] person's intention or belief is a matter of fact, and if a misrepresentation is made with regard thereto, the misrepresentation is one of fact. The gist of the fraud in such cases is not the breach of the agreement to perform, but the fraudulent intent of the promisor, the false representation of a present existing intention to perform where such intent is in fact nonexistent."  Id.

## 3.  Application - Tort versus Contract

MPC's main argument for summary judgment on these claims is that Learjet cannot makes the fraud claims simultaneously with its breach of contract claims.

A District of Kansas case discussed a plaintiff's pursuit of a fraud claim contemporaneously with a breach of contract claim:

> A party may not bring a tort claim based on the same facts alleged in its contract claim if the contract specifically defines the duties of the parties.  Such a claim is prohibited because a party may not base a tort claim upon a contractually created duty.  A tort claim is based on a contractual duty only if there is no independent tort duty upon which to rely.  A party may be liable in tort for breaching an independent duty towards another, even where the relationship creating such a duty originates in the parties' contract.  If there is no independent tort duty [a] plaintiff's claims are precluded.

Graphic Technologies, Inc. v. Pitney Bowes Inc., 998 F. Supp. 1174 (D. Kan. 1998) (internal quotations and citations omitted).

An older Kansas Court of Appeals case has also described the tort versus breach of contract issue:

> The difference between a tort and contract action was extensively discussed in Malone v. University of Kansas Medical Center, 220 Kan. 371, 374, 552 P.2d 885 (1976).
>
> > 'A breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement. A tort, on the other hand, is a violation of a duty imposed by law, a wrong independent of contract. Torts can, of course, be committed by parties to a contract. The question to be determined here is whether the actions or omissions complained of constitute a violation of duties imposed by law, or of duties arising

60

> by virtue of the alleged express agreement
> between the parties.'
> ....
>   'Where a contractual relationship exists
> between persons and at the same time a duty
> is imposed by or arises out of the
> circumstances surrounding or attending the
> transaction, the breach of the duty is a tort....'

Atkinson v. Orkin Exterminating Co., 5 Kan. App. 2d 739, 745, 625 P.2d 505, 511

(1981).  The 1996 comments to Kansas' UCC state: "In many cases, a

misrepresentation as to the quality of the goods may give rise to both a claim for

breach of express warranty under 84-2-313 and a claim for misrepresentation or

fraud under traditional tort law."  1996 Kansas Comment to K.S.A. § 84-2-721

(stating that remedies for fraud "include all remedies available under this article for

nonfraudulent breach").  In addition, although it is clear that punitive damages are

not recoverable for breach of contract absent an independent tort justifying them,

Dold v. Sherow, 220 Kan. 350, 355, 552 P.2d 945, 950 (Kan. 1976), the same

conduct may form the basis for a breach of warranty damages claim and a fraud

claim for punitive damages.  Id. at 355-56, 552 P.2d at 950.

The Court finds that at least some of Learjet's fraud claims are properly pled

as common law fraud claims, independent of Learjet's claims for breach of

warranty and breach of contract.  Learjet's fraud theories, at least in part, are based

on MPC's representations leading up to the parties' contractual relationships.

61

They do not solely rely on duties arising by virtue of the parties' agreements.  For

example, independent of any contract, MPC allegedly made quality control

representations to Learjet beginning with its response to Learjet's RFP, which it

allegedly knowingly did not comply with.  Because there is no final pretrial order

which clearly defines the specific fraud claims Learjet is making, and because

MPC did not singularly address each allegation of fraud, but challenged the fraud

theories in their entirety, it is difficult to determine whether <u>some</u> of the fraud

claims may, in fact, be precluded because they only represent breaches of

contractual duties set out in the relevant contracts between the parties.  Before trial,

the parties will be required to specifically identify in the pretrial order each claim

of fraud and to address, as to each claim, whether there are alleged deficiencies in

the claim either because it is merely a breach of contract claim, or for other reasons

such as lack of reliance, etc.

At this stage of the proceedings, summary judgment is not appropriate on

either fraud theory.  Genuine issues of material fact remain for resolution by the

fact finder and MPC has not shown it is entitled to judgment as a matter of law.

For example, regarding Learjet's fraud theory based on MPC's alleged false

representations as to material facts, Learjet has presented evidence that false

representations were made by MPC regarding MPC's production methods (<u>e.g.</u>, the

certificates of compliance, the use of gas nitriding rather than liquid nitriding, the use of 410SS), that members of MPC's management knew the production methods were not as specified, that MPC did this with reckless disregard for the truth of the certificates of compliance, and that Learjet justifiably relied on MPC's false representations to Learjet's detriment.[17]  This representation would certainly be material, because the production methods to be utilized by MPC were based on quality control assurances.  This is just one example of the continued viability of Learjet's fraud by material misrepresentation theory.

Regarding Learjet's second fraud theory, for fraudulent promises of future events, some of the same facts could be utilized.  At the time MPC negotiated the 2001 contract, it was allegedly already manufacturing other parts (not HSTAAs) with the unapproved process, yet it represented to Learjet that it would use an approved FAA compliant process as to the HSTAAs.  It appears to be undisputed that by December 2001 – only five months after signing the 2001 contract, MPC was using the same in-house and unapproved nitriding process on HSTAA parts.  This, coupled with testimony that MPC was actively seeking to increase the use of

---

[17] MPC introduces extensive facts regarding its testing of the 410SS in August 2003, the basis for its choice of 410SS for the Model 45 HSTAA, its history of use of 410SS, and the opinion of its expert, Gary Fowler, regarding the cause of the cracks found in -001 HSTAA.  These facts, however, at best create a genuine issue of material fact whether the 410SS was appropriate for use by MPC.  They do not change the alleged fact of misrepresentation.

gas nitriding in-house, and that bonuses to the manager of that process were

dependent on how many parts were processed with this in-house procedure, could

reasonably support the conclusion that when MPC executed the 2001 contract it

did not intend to comply with the requirements of the 2001 contract which

provided for liquid nitriding.  There is a factual issue for the fact finder whether

MPC's production promises were made with the intent to deceive and for the

purpose of inducing Learjet to enter the 2001 contract.  Again, however, this is

merely one example of a viable claim for fraud based on promises of future events.

The Court need not detail all Learjet's fraud allegations to deny MPC's motion.

For the above stated reasons, MPC's motion on Learjet's fraud claims must

be denied.[18]

## D.  Learjet and Flexjet's Claim for Breach of Express Warranty Based on the 2001 Contract

---

[18]  MPC's motion for summary judgment was directed to both Learjet's fraud claims and its punitive damages claim.  The gist of the argument as to punitive damages was that absent any proof of fraud, no punitive damages could be awarded.  MPC's initial brief did not, however, discuss the statutory requirements for imposing liability on a corporation for punitive damages.  Likewise, Learjet's response focused on whether there was proof of fraud that would support an entitlement to punitive damages.  It was only in the final three pages of MPC's reply that the issue of corporate liability for punitive damages was raised.  (Doc. 164 at 19-20.)

The Court agrees that K.S.A. § 60-3702(d) governs the right to recover punitive damages from a corporation, and that this section requires proof that the actions of the corporation's agent or employee were either authorized or ratified by the corporation.  However, those issues are not properly before the Court because they were not raised in MPC's motion.

Plaintiffs jointly move for partial summary judgment on the liability portion of their claims for breach of contract and breach of express warranty based on the 2001 contract. (Doc. 141.) Plaintiffs contend that MPC breached the 2001 contract and its express warranties because MPC's HSTAAs failed to meet airworthiness authorities' requirements, as evidenced by the FAAs emergency airworthiness directives which grounded the Model 45s. (Doc. 142 at 26.) MPC responds that Learjet's reading of the parties' agreements is incorrect; that to find a breach of the 2001 contract and warranty, the contract requires that the failure to be airworthy results from a defect; and that a factual issue remains whether a defect is present. (Doc. 152 at 27-30.)

Under the UCC, "[t]he obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." K.S.A. § 84-2-301. In the sale of goods, express warranties by a seller may be created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain," or "[a]ny description of the goods which is made part of the basis of the bargain," or by "[a]ny sample or model which is made part of the basis of the bargain." K.S.A. § 84-2-313(1)(a)-(c). However, "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not

create a warranty."  K.S.A. § 84-2-313(2).  Under section 84-2-313, a

representation by the seller must become part of the basis for the bargain, and thus

must be relied upon by the buyer to be an express warranty.  However, the buyer

need not show any specific or particular reliance.  <u>Olathe Mfg., Inc. v. Browning

Mfg.</u>, 259 Kan. 735, 746, 915 P.2d 86, 94 (Kan. 1996).

   The construction of a contract is a question of law that can be determined by

the Court on a motion for summary judgment.  <u>West v. Prairie State Bank</u>, 200

Kan. 263, 270, 436 P.2d 402, 408 (Kan. 1968).  "A cardinal rule in the

construction of contracts is that contracts must be interpreted in light of their own

peculiar provisions, and every provision must be construed, if possible, so as to be

consistent with every other provision and to give effect to all."  <u>Wiles v. Wiles</u>, 202

Kan. 613, 619, 452 P.2d 271, 276 (Kan. 1969).  "If a contract is clear and

unambiguous, the terms must be construed in such a manner as to give effect to the

intention of the parties at the time they entered into the contract, and this must be

determined from the four corners of the instrument."  <u>Wiles</u>, 202 Kan. at 619, 452

P.2d at 276-77; <u>see also</u> <u>Fast v. Kahan</u>, 206 Kan. 682, 684, 481 P.2d 958, 961

(Kan. 1971) (stating that if the terms of a written instrument are clear and

unambiguous, there is no occasion for applying rules of construction).

   No party makes any real argument that the terms used in the 2001 contract

are ambiguous.  The language in a contract is ambiguous when the words used to express the meaning and the intention of the parties may be understood to reach two or more possible meanings.  Richardson v. Nw. Cent. Pipeline Co., 241 Kan. 752, 758, 740 P.2d 1083, 1087 (Kan. 1987).  MPC does argue, however, that if the contract is ambiguous, it should be construed against Learjet.  (Doc. 152 at 19.) The Court finds that the 2001 contract in general, and the language focused on herein (i.e., section 3.3) is not ambiguous.  See Allied Mut. Ins. Co. v. Moeder, 30 Kan. App. 2d 729, 733, 48 P.3d 1, 4 (Kan. Ct. App. 2002) (stating that the court's "job is to use common sense and not to strain to create an ambiguity in a written instrument when one does not exist").  There is no ambiguity in the warranties of the parties' 2001 contract, especially when the contract is read as a whole.  See Decatur County Feed Yard, Inc. v. Fahey, 266 Kan. 999, 1005, 974 P.2d 569, 574 (Kan. 1999) ("The cardinal rule of construction, though, requires the court to construe all provisions together and in harmony rather than in isolation." (Internal quotations omitted)).

The 2001 contract language at issue states:

> 3.3    Supplier further represents and warrants to Learjet that the Items' performance shall at all times meet airworthiness authorities', Learjet and Operator requirements and for that purpose, Supplier shall:
>
> 3.3.1  perform all of its warranties, guaranties

and obligations as set forth in this
Contract; . . .

The parties to this contract, and anyone using common sense to interpret the

contract, understand the term "airworthiness authorities' . . . requirements" to

include the FAA's airworthiness determinations.

The Court acknowledges that the airworthiness warranty is contained in

Article 3 of the 2001 contract which is entitled "Scope of Work" rather than in

Article 11 entitled "Warranty."  However, no one can seriously contend that the

language of Article 3.3 does not create an express warranty.  The language itself

explicitly states that MPC "represents and warrants" to Learjet that the items will,

at all times, meet the requirements of the FAA.[19]  Furthermore, while 3.3 goes on

to say that in order to meet the requirements of airworthiness authorities, MPC will

perform the warranties set out in Article 11, the Court construes 3.3 to create an

absolute and unqualified express warranty that the part will meet airworthiness

authorities' requirements for any reason, and in order to enforce that warranty

Learjet does not need to also prove a violation of one of the warranties in Article

11.  Therefore, the Court believes that the express warranty in 3.3 cannot be read to

_____

[19]  The parties specifically agreed that the "[t]he titles to the Articles in this
Contract have been inserted for convenience of reference only, do not form part of this
Contract, and shall not in any way affect the interpretation thereof."  2001 contract,
Article 38.1.  Therefore, it is immaterial that the airworthiness warranty is contained in
Article 3 rather than in Article 11.

also require a finding of a defect in the part.

Even if the warranty in 3.3 is somehow dependent upon an additional showing of a violation of a warranty in Article 11, this still does not require that there be a defect in the part.  The warranty section of Article 11 of the 2001 contract, as referenced in section 3.3.1, states as follows:

> 11.1   Supplier warrants that each Item, Spare Part and Component, at the time of delivery, shall:
>
> > 11.1.1    be designed to be suitable for use in the Aircraft;
> >
> > 11.1.2    conform to and meet the requirements of the L[earjet] T[echnical] R[equirements] D[ocument]s referred to herein;
> >
> > 11.1.3    be free from defects in design; and
> >
> > 11.1.4    be free from defect in material or workmanship, or both.

The phrase in 11.1.1, "designed to be suitable for use," clearly means "usable design for the aircraft."  This must describe something completely different from either "defects in design" or "defect in material or workmanship" which are the subject of 11.1.3 and 11.1.4.  To read it in any other way would be to render a portion of the article redundant and of no meaning.  See Augusta Medical Complex, Inc. v. Blue Cross of Kansas, Inc., 227 Kan. 469, 474, 608 P.2d 890, 894

(Kan. 1980) (stating that a contract must be interpreted in light of its particular provisions and every provisions material to ascertainment of the intention of the parties must be construed, if possible, so as to be consistent with every other provision and to give effect to all).  Furthermore, Article 11.1 is written in the conjunctive not the disjunctive, therefore MPC is warranting that <u>each</u> of the concepts identified in 11.1.1 through 11.1.4 will be met by the part.   Therefore, if Learjet shows that the HSTAA does not meet the requirements of either 11.1.1 or 11.1.2, the warranty has been breached notwithstanding any issue of whether the part is "defective."

Therefore, even reading Articles 3.3 and 11.1.1  together, MPC has warranted that it will meet the FAA's and Learjet's requirements by providing a product that will be usable in the Model 45s.  This does not require that Learjet prove either a design or manufacturing defect in the product under 11.1.3 or 11.1.4.[20]

───────────────

[20]  A similar analysis would apply to the requirement in 11.1.2 that the HSTAA conform to and meet the requirements of the L[earjet] T[echnical] R[equirements] D[ocument]s.  Those documents are defined in Article 1.15 to mean the documents identified in Article 3.2, which in turn describes those documents as the ones attached as Appendix 4 to the 2001 contract.  A review of Appendix 4 identifies drawings and specifications dated between 1996 and 2001.  It is impossible to tell from the parties briefs whether the HSTAA fails to conform in any way to those documents.  However, if there was such proof, it would be a breach of MPC's warranty wholly separate and apart from the issue of whether the HSTAA was defective in design or manufacturing.

The basis for plaintiff's summary judgment motion is liability only - did MPC breach the warranty provisions of the 2001 contract?  See Doc. 142 at 27 ("Plaintiffs ask this court to rule only on liability (*i.e.*, that MPC breached the 2001 Contract and its express warranties).").  The court finds that the 2001 contract was breached.  No rational fact finder could conclude otherwise but that MPC breached the 2001 contract.  See City of Topeka v. Watertower Place Dev. Group, 265 Kan. 148, 154, 959 P.2d 894, 899 (Kan. 1998) (stating that when there are no disputed facts and there is no other factfinding necessary, the question of whether a contract is breached is a matter of law).

The uncontroverted evidence is that the FAA issued two emergency airworthiness directives.  The March 2003 airworthiness directive called the use of the -001 HSTAA an "unsafe condition" and required replacement of all -001 HSTAA to -005 HSTAA.  (Doc. 142 Exh. F).  However, the -001 HSTAA were produced pursuant to the 1994 contract or some extension thereof.  They were not designed and manufactured pursuant to the 2001 contract, so the March 2003 airworthiness directive is inapplicable to any breach of contract/warranty under the parties' 2001 contract.

The August 2003 airworthiness directive also called the use of the -005 HSTAA an "unsafe condition," required replacement of all -005 HSTAA, and

prohibited use of Model 45s that had -005 HSTAAs.  (Doc. 142 Exh. G).  The

parties' 2001 contract encompassed the design and manufacture of the -005

HSTAAs.  <u>See</u> Doc. 142 Exh. D at 14 (stating, in provision 3.1, that MPC "shall

design, develop, test, Qualify, manufacture, interface with Learjet . . ., integrate on

the Aircraft, perform all necessary Work and deliver to Learjet . . . for use on the

Aircraft the following interchangeable Items in accordance with this Contract: . . .

Learjet Part Number . . .-005 Pitch Trim Actuator").

The parties 2001 contract required that MPC meet the FAA's and Learjet's

requirements by supplying a usable product.  MPC claims that it has only breached

the 2001 contract if its HSTAA were unairworthy <u>because of a defect</u>.  As noted

above, the 2001 contract does not require this narrow reading, however.  If MPC

failed to supply a <u>usable</u> product per the FAA or per Learjet, it breached its

warranty.  Of course, it also breached its warranty if it supplied a product with a

design or manufacturing <u>defect</u>, but the determination of whether MPC's HSTAA

was <u>defective</u> is irrelevant to whether the HSTAA was <u>usable</u>.  It is uncontroverted

that the -005 HSTAAs produced under the 2001 contract were unusable by Learjet

and FAA standards.[21]  As a result, MPC's breach of contract and breach of express

---

[21]  Article 3.3 of the 2001 contract states that "[s]upplier further represents and
warrants to Learjet that the Items' performance shall <u>at all times</u> meet airworthiness
requirements . . . ." (emphasis added).  Article 11, the  warranty section of the contract,

warranty is clear.

MPC's does not disagree that the airworthiness directives were issued as described herein, but argues that the opinions within the airworthiness directives are inadmissible hearsay and not supported by a proper foundation.  The airworthiness directives, however, are admissible evidence.  They are federal regulations, issued and published in the federal register.  See 14 C.F.R. § 39.3 ("FAA's airworthiness directives are legally enforceable rules. . . ."); see also 14 C.F.R. § 39.5 (stating that the FAA issues an airworthiness directive if two conditions are satisfied: that an unsafe condition exists in the product; and that the condition is likely to exists or develop in other products of the same type design); Newton v. FAA, 457 F.3d 1133, 1136-37 (10th Cir. 2006) (discussing the differing degrees of deference given to federal agency pronouncements and stating that: "As for the FAA's regulations, they are clearly entitled to Chevron deference.").

Regardless, whether the -005 HSTAA was actually unsafe is irrelevant to the issue the Court is presented.  MPC warranted that it would provide -005 HSTAAs

_____

however, provides in 11.1 and 11.1.1 that MPC warrants that each Item shall, at the time of delivery "be designed to be suitable for use."  Article 11.2 also states that this warranty (in 11.1.1) shall "start at the time of and from delivery" of each item, and "shall remain in full force and effect for an unlimited period of time."
    Regardless, the timing of MPC's breach of this warranty is irrelevant, because the -005 HSTAAs were not usable at the time they were made, despite when the discovery of this failure was made.  The Court's determination that a breach has occurred applies to those -005 HSTAAs that were produced pursuant to the 2001 contract.

that were "suitable for use" per Learjet and FAA standards.  The FAA determined

the -005 HSTAA were not suitable, and Learjet could not use MPC's HSTAA on

its Model 45s without FAA certification.[22]  Whether the FAA was incorrect in its

determination is irrelevant.

In addition, it is clear from reading the parties' 2001 contract that they

intended to use the FAA as a benchmark for their relationship.  Examples from the

parties' 2001 contract, in addition to Article 3.3 which requires MPC to meet

airworthiness authorities' requirements, include:

1.   The term "Certification" is defined as "obtainment of all relevant
     authorizations from the applicable airworthiness authorities of each
     country in which the Aircraft is likely to operate" (Article 1.2) and the
     term "Qualification" or "Qualify" is defined as "the performance of
     all the activities required to prove to the satisfaction of the
     Certificating authorities and to Learjet that . . . the Items meet or
     exceed . . . airworthiness authorities' requirements."  (Article 1.23)

_____

[22] Plaintiffs introduce a plethora of additional facts regarding the FAA's processes
leading up to the issuance of emergency airworthiness directives, including: (1) testimony
from David Hirt, an aerospace engineer in the mechanical systems department of the FAA
who recommended a finding by the FAA that there was an unsafe condition on the Model
45, which led to the March 2003 airworthiness directive; (2) testimony from Todd Dixon,
a supervisor in the aerospace engineering department of the FAA, who testified regarding
the process leading up to an airworthiness directive and who also recommended the FAA
find an unsafe condition; (3) testimony from Alvin Phillips, a member of the FAA's
military certification office, who testified regarding the FAA's investigation of MPC's
production processes leading up to the August 2003 airworthiness directive.
     The Court need not specifically recount them, however, because it finds that the
issuance of the FAA's emergency airworthiness directives grounding the Model 45s is
uncontroverted evidence that the HSTAAs were not "suitable for use."

2.    Both FAA (Federal Aviation Administration) and FAR (Federal Aviation Regulations) are defined terms.  (Articles 1.8 and 1.9)

3.    Article 3.3.5 requires MPC to "participate in joint meetings" with airworthiness authorities, as required.

4.    Article 3.3.6 requires MPC to "spend the necessary design and manufacturing efforts, time and money, to correct any Items deficiencies or performance problems to meet airworthiness authorities' requirements."[23]

5.    Article 3.4.2 requires MPC to provide its "Qualification documents" to Learjet.

6.    Article 8.1(1) states that Learjet, MPC and the airworthiness authorities will work together to meet the requirements of the 2001 contract.

7.    Article 8.1(2) states that until Learjet has obtained certification of the Model 45, MPC is responsible for any changes required by airworthiness authorities in order to obtain certification.

8.    Article 8.2.3 defines the changes MPC is required to make without charge to Learjet, including changes to maintain certification and to comply with new airworthiness authorities' requirements.

9.    Article 8.3.5 permits Learjet to reject changes made by MPC that are not essential to meet the requirements of airworthiness authorities.

10.   Article 10.13 requires MPC to submits its qualification documentation to Learjet and section 10.24 requires MPC to attach its airworthiness certification documents to shipped Items.

---

[23]  Notably, this section speaks in terms of "deficiencies or performance problems" and not "defects" in either design, material or workmanship.  Cf. Article 11.1.3 and 11.1.4.  Again, this speaks of something broader than the obligation of MPC to remedy any post-delivery "defect" which causes the certificate of airworthiness to become invalidated.  See Article 20.7.

75

11. Article 20 states, in great detail, the qualification and certification of MPC's HSTAA and specifically references the FAR and airworthiness requirements ,and the cost responsibility for qualification and certification.

It is clear from a full reading of the parties' 2001 contract that they intended to rely on the airworthiness authorities as a reference point for their agreement.

The Court wishes to emphasize however, that it has resolved only the narrow issue upon which it has been moved--whether MPC breached section 3.3 of the 2001 contract.  For example, the Court has not determined who this duty runs to. Clearly, a breach of the express warranty in Article 3.3 runs to Learjet as a signatory to the 2001 contract and therefore summary judgment on this issue can be granted in Learjet's favor.  However, the Court cannot conclude on the present record, whether that warranty runs in favor of Flexjet.  Article 11 does specifically state that "[t]he warranty contained in this Article 11 shall be for the benefit of Learjet, the Operators, or their respective successors or assigns." (emphasis added). The term "Operator" is defined to "mean the owner, or user, or lessee (or in some instances a combination of these) of the Aircraft."  (2001 contract, Article 1.19.) While it appears that Flexjet falls within this definition of an operator, there is nothing in Article 3.3 which states the warranty of airworthiness found in  Article 3 is for the benefit of an operator.  For this reason, the Court cannot grant summary judgment on this issue in favor of plaintiff Flexjet.

76

Likewise, the court is not making a ruling concerning the scope of the breach (i.e., a fact issue remains regarding the extent of coverage of the 2001 contract), damages flowing from the identified breach, or whether MPC breached other portions of the 2001 contract.  The Court agrees with MPC: "the portion of Plaintiffs' motion relating to the affirmative claims they have made really only seeks a declaration that MPC breached an alleged express warranty made in one section of the 2001 Contract, Articles 3.3."  (Doc. 152 at 14.)

For the reasons stated herein, the Court grants the <u>narrow</u> motion for summary judgment in favor of plaintiff Learjet, but denies the motion as to Flexjet. The Court limits its determination to the express parameters detailed herein.

**E.  MPC's Counterclaim for Breach of Contract**

Finally, Learjet moves for summary judgment on MPC's counterclaim for breach of contract.  MPC's counterclaims seek (1) a set-off for sums owed under the 1994 contract, (2) payment for HSTAAs MPC overhauled from -001 to -005 after march 2003, and (3) compensation for development of the -007 HSTAA under the 2001 contract.  (Docs. 23 at 3-5; 152 at 27.)  Learjet moves for summary judgment on the basis that MPC's claim is time-barred, or alternatively, without merit because it is contrary to the parties' contract.  (Doc. 141.)  MPC responds that: regarding the 1994 contract and the -001 HSTAAs, an alternate provision of

the contract provides the basis for MPC's claim; regarding the HSTAAs overhauled from -001 to -005 after March 2003, the UCC entitles MPC to its costs in improving the -005 HSTAAs; and regarding the -007 HSTAAs, Learjet has misinterpreted the 2001 contract.  (Doc. 152.)

The Court will separately analyze MPC's three portions of its breach of contract counterclaim.

**1.  Setoff for Modifications to the -001 HSTAAs in 1994.**

MPC's counterclaim first seeks "the sums Learjet should have paid for costs MPC was caused to incur because of changes in Learjet's specifications between the agreement to the initial SCD in 1994 and submission of the -001 HSTAA for qualification."  (Doc. 152 at 28.)  Learjet argues that MPC's claim for reimbursement of costs under the 1994 contract (i.e., for the -001 HSTAAs) is barred by the statute of limitations and, alternatively, that the 1994 contract requires MPC to absorb all costs associated with "design, development, and certification" of the HSTAA.

First, regarding the statue of limitations, Learjet states: "MPC filed its counterclaim on June 27, 2005, nearly nine years after MPC last incurred its alleged expenses on the -001 units.  The uncontroverted facts show that MPC demanded reimbursement from Learjet (and thus had actual knowledge of the

78

alleged breach on which the counterclaim is based) in April 1996."  (Doc. 142 at

36.)  The UCC's statute of limitations is four years.  K.S.A. § 84-2-725 ("An action

for breach of any contract for sale must be commenced within four years after the

cause of action has accrued.").

MPC acknowledges the UCC's statute of limitations, but contends this

portion of its counterclaim proceeds under Kansas' procedure for set off.  Under

Kansas law, when a counterclaim "is not brought before the running of the statute

of limitations, then the counterclaim cannot be used as an affirmative action.

However, the counterclaim can still be used as a pure defense or as a set off against

the plaintiff's claim if the claim, (a) coexisted with the plaintiffs' claim and (b)

arises out of the "contract or transaction" on which the plaintiffs' claim is based."

Mynatt v. Collis, 274 Kan. 850, 865, 57 P.3d 513, 525 (Kan. 2002) (internal

quotations omitted).

MPC contends Learjet's claim for breach of the 1994 contract is the claim

that coexists with MPC's claim for set off, and that, therefore, Learjet's claim and

MPC's counterclaim arise out of the same contract.  The court agrees with MPC.

Therefore, the Court determines that the UCC's statute of limitations would bar

MPC's affirmative claim, but that MPC meets Kansas' requirements for a

defensive claim of set off.

79

Learjet's next basis for moving on the first portion of MPC's counterclaim is that the 1994 contract's language bars the claim being made.  Learjet argues: "MPC is not entitled to benefit from its alleged design and development expenses for the -001 units as an "offset" because the 1994 Contract expressly imposed on MPC the obligation of absorbing design and development costs.  Specifically, the 1994 Contract states that 'SELLER [MPC] shall be responsible for all non-recurring cost associated with the design, development and certification of the HSTAA.'"  (Doc. 142 at 37.)

The 1994 contract language relied upon by Learjet contends is under "Article 4 - Buyer Support" which states, in pertinent part:

> The support provided under this article shall be at no cost to [Learjet].
>
> 1.   <u>Design Support</u>
>
> [MPC] will design, develop, qualify HSTAAs and assist in the certification of the Learjet Model 45 HSTAA in conjunction with the aircraft development schedule and the technical baseline defined in Article 1.  [MPC] will be responsible for all non-recurring cost associated with the design, development and certification of the HSTAA. [MPC] shall provide Technical and/or Engineering support to assist [Learjet] as required with the HSTAA installation design.

Article 1 of the 1994 contract is titled "Technical Specification (SCD)" and states that "[MPC] shall be responsible for the design, development, certification and

subsequent supply of HSTAA to satisfy the requirements of the Specification

Control Drawing . . . and MPC Response to RFP . . . ."

The 1994 contract language MPC contends controls is located in "Article 6 -

Modifications and Changes."  The pertinent part of that section states:

> Both [Learjet] and [MPC] recognize that changes and
> modifications create added costs and schedule risks and,
> therefore, agree to cooperate to minimize the number of
> changes and handle changes to protect schedule and
> minimize cost.  "Minor" changes are expected and
> considered part of the base pricing.  The cumulative impact
> of the "Minor" changes will be tracked and added to the
> base price when they exceed three percent (3%).

The 1994 contract does not define "minor change."

The pivotal question, therefore, is which Article of the 1994 contract applies:

Article 4 which requires MPC to bear all "non-recurring cost associated with the

design, development and certification of the HSTAA," or Article 6, which requires

Learjet to add the costs for "minor" changes to the base price for each HSTAA

once a certain threshold has been met.  The set off amount MPC seeks is for

changes made "in Learjet's specifications between the agreement to the initial SCD

in 1994 and submission of the -001 HSTAA for qualification."  The only evidence

before the Court is that changes were made.  It is a material factual issue whether

these changes were "design, development and certification" costs or a cumulation

of "minor" changes.  It will be left to the fact finder to determine whether MPC's

81

changes were development, non-recurring costs or minor changes.

As a result, Learjet's motion for partial summary judgment on the set off

portion of MPC's counterclaim must be denied.

**2.  Payment for HSTAAs MPC Overhauled from -001 to -005 After March 2003 (i.e., overhauls made to the -001 HSTAA to make MPC's HSTAA compliant with the first emergency airworthiness directive).**

MPC's second category of damages making up its counterclaim is for

payment for the HSTAAs MPC overhauled from the -001 to the -005 version after

March 2003.  (Doc. 152 at 30.)  Learjet argues that MPC cannot recover its costs

for the -005 HSTAAs shipped after the March 2003 grounding because the FAA

found those HSTAAs unairworthy via the August 2003 airworthiness directive.

Learjet admits that "[d]uring the development of the -005 in 2001, Learjet had

agreed to pay $5,075 to MPC for each conforming -005 unit delivered by MPC to

Learjet."  Learjet argues, however, that it "is not and was not ever obligated to pay

MPC for units that did not meet the contractual requirements of the 2001 Contract,

including the requirements that all units meet the requirements of the

Airworthiness Authorities (as defined in the 2001 Contract)" and states that,

pursuant to the 2001 contract, "Learjet had no obligation to pay for HSTAA units

that were un-airworthy and, therefore, defective."  Learjet contends that "[t]he -005

HSTAA units manufactured, delivered and installed after March 13, 2003 clearly

did not meet the requirements of the airworthiness authorities, i.e., the FAA."

(Doc. 142 at 38-39.)

MPC responds that (1) Learjet incorrectly assumes that provisions of the 2001 contract relate to the -001 HSTAAs overhauled to -005 HSTAAs; (2) the FAA's airworthiness directives are not conclusive evidence of breach of warranty relieving Learjet of the obligation to pay for the overhauls; and (3) the UCC's provision on breach of warranty (K.S.A. § 84-2-714) does not relieve the buyer of paying for goods, but gives as its measure of damages the diminution in value to the goods from the claimed breach of warranty.  (Doc. 152 at 30-31.)

The provisions of the 2001 contract that Learjet believes prohibits MPC's request for payment of these fees are the same provisions discussed in plaintiffs' joint motion on MPC's liability under the 2001 contract for breach of contract/warranty.  The Court has already found that MPC breached Article 3.3 of the parties' 2001 contract.  Therefore, MPC's first and second responsive arguments fail.  See supra at section IV.D.[24]

Regarding MPC's third argument, MPC contends that K.S.A. 84-2-714

---

[24]  While the Court has concluded that there was a breach of the warranty in the 2001 contract for the reasons noted, it has not addressed the related question as to whether that breach of warranty acts to relieve Learjet of the obligation to pay for the overhauls. That issue is discussed below in light of the provisions of K.S.A. 84-2-714.

governs breach of warranty claims; that section 84-2-714 gives damages to a buyer

whose seller has breached a warranty, but that the amount of the damages is the

amount of the diminished value to the goods claimed from the breach of warranty;

that, therefore, if Learjet does prove MPC breached a warranty, Learjet was still

obligated to pay for the market value of the diminished value goods it accepted;

and that there is no evidence regarding these values.  (Doc. 152 at 30.)

The applicable portion of the UCC, section 84-2-714, states, in pertinent

part:

> The measure of damages for breach of warranty is the
> difference at the time and place of acceptance between the
> value of the goods accepted and the value they would have
> had if they had been as warranted, unless special
> circumstances show proximate damages of a different
> amount.

K.S.A. § 84-2-714(2).  The Kansas comments to section 84-2-714 state:

> Subsection (2) describes the standard measure of damages
> for breach of warranty, unless special circumstances require
> otherwise.  A buyer may recover for breach of warranty the
> difference, at the time and place of acceptance, between the
> market value of the goods accepted and the market value of
> the goods had they been as warranted.  This is often called
> the buyer's "primary economic loss."  Market value is not
> necessarily the same as the contract price, although contract
> price may be good evidence of market value.  When repair
> of the goods is possible, the best measure of damages for
> breach of warranty is the cost of repair.  International
> Petroleum Serv., Inc. v. S&N Well Serv., Inc., 230 K[an].
> 452, 639 P.2d 29 ([Kan.] 1982) (used goods).  If the cost of

> repair exceeds the price of the goods, however, the purchase price should serve as a cap on damages, at least if replacement goods are available.  If repair does not give the goods their full warranted value, the buyer should be able to recover any remaining difference as well.  If the goods cannot be repaired, the court will need to determine their value as warranted and their value as accepted.  In unusual cases, particularly when the seller makes an expansive performance guaranty, the measure of damages under this section may exceed the purchase price.  See Chatlos Sys., Inc. v. National Cash Register Corp., 670 F.2d 1304 (3d Cir.), cert. dismissed, 457 U.S. 1112 (1982).

Id. at Kansas Comment 2.  The comments make clear that Learjet's remedy for breach of warranty under the UCC is not to simply refuse to pay for goods.[25]

The parties have offered no evidence regarding market value of the -005 HSTAAs that the FAA found caused an unsafe condition, the costs of repair of these HSTAA, what an "overhaul" entails, etc.  The Court simply does not have enough information to grant Learjet's motion for summary judgment on this portion of MPC's counterclaim.  For this reason, Learjet's motion must be denied.

## 3.  Compensation for Development of the -007 HSTAA Under the 2001 Contract.

MPC's final category of damages that make up its counterclaim are its costs

---

[25]  Interestingly, the 1994 contract provisions concerning damages recoverable by Learjet if MPC failed to deliver conforming equipment specifically stated that MPC "shall pay the difference between the value of the equipment delivered and the value they would have had if they had been as warranted."  Article 13.1.2.  The fact that no similar provision is found in the 2001 Contact is immaterial, however, and in the absence of any specific contract language to the contrary, Learjet is left with damages under the UCC.

for the development of the -007 HSTAA.  (Doc. 152 at 30.)  Learjet argues that

MPC cannot recover costs for development of the -007 HSTAA because the 2001

contract required MPC to absorb costs related to design deficiencies and

airworthiness standards.  Learjet states, regarding the -007 HSTAAs: "under the

2001 Contract, MPC was contractually obligated to conduct this design and

development at its own cost and at no cost to Learjet." and "the sole reason for the

design and development of the -007 HSTAA unit was to meet the requirements

established by the FAA in order for any Learjet 45 aircraft to get back into the air

following the August 13, 2003 grounding."[26]  (Doc. 142 at 40-41.)

MPC responds that it is entitled to design and development costs for the -007

HSTAAs pursuant to section 8.2 of the parties' 2001 contract (located with Article

8.2 - "Post-Certification").  The pertinent portion of Article 8.2 states:

> 8.2.1 After the Aircraft has obtained unrestricted
> Certification as provided for in Article 20
> ("Qualification and Certification") either party may,
> at any time, submit to the other a proposal for [MPC]
> to make changes which result in an Items or Aircraft
> performance improvement or economic benefits to
> the Operator. . . . [MPC] shall bear all economically
> justifiable costs incurred when the changes will
> reduce [MPC]'s manufacturing costs or when the

---

[26]  Learjet also argues that several portions of the 2001 contract support its argument, including Article 3.3, Article 11, Article 8.2.3, and Article 20.7.  (Doc. 142 at 42-43.)

costs are ten percent (10%), or less, of each Item's recurring price . . . .

.   .   .

8.2.3  Notwithstanding the provisions of paragraph 8.2.1, [MPC] shall implement the following at no charge to Learjet or the Operator:

1)  changes made to remedy any safety issue;

2)  changes made to the Items to maintain Aircraft certification . . .

3)  changes made to comply with any new airworthiness authorities requirements related to the Items.

Considering the contract provisions cited above, the parties' 2001 contract shows that the 2001 contract prohibits MPC's claim for design and development costs of the -007 HSTAA. Article 8.2.3(3) requires MPC to bear the cost of "changes made to comply with new airworthiness authorities requirements" for its HSTAAs. Article 8.2.3 requires MPC to "implement" those required changes. "Implementing" includes the design and development required to carry out the airworthiness directive. The uncontroverted evidence shows that the -005 HSTAAs were overhauled to -007 HSTAAs because of the requirements of the airworthiness authorities' August 2003 airworthiness directive.

MPC attempts to argue that Article 8.2.3(3) is not applicable. MPC states, in

87

totality: "Finally, as to subpart (3), no one has asserted the FAA adopted a new <u>rule or regulation</u> that made the otherwise acceptable -005 HSTAA no longer appropriate for use on aircraft.  Rather, the FAA applied the rules already in place to ground the Model 45s and evaluate whether to re-qualify the -005 HSTAA." (emphasis added).  This argument is nothing more than a weak attempt to attack a clearly applicable contract term.  Article 8.2.3 triggers MPC's liability for costs for changes made when the FAA issues "any new airworthiness authorities <u>requirements</u> related to the Items." (emphasis added).  An airworthiness directive mandating grounding of all Model 45s until the -005 HSTAA are replaced with -007 HSTAA is clearly an airworthiness authority "requirement."  MPC's suggestion that this section would operate only where there is a completely new FAA rule or regulation is not supported by the language of the contract.

As a matter of law, MPC cannot recover damages for costs which the contract it negotiated prohibits.  See <u>Wiles v. Wiles</u>, 202 Kan. 613, 619, 452 P.2d 271, 276 (Kan. 1969) (stating that an unambiguous contract must be given effect).  Because the parties' 2001 contract prohibits MPC's counterclaim for design and development costs associated with the overhaul of the -005 HSTAAs to -007 HSTAAs, Learjet's motion for summary judgment on this portion of MPC's counterclaim is granted.

## V.  CONCLUSION

For the reasons stated more fully herein: MPC's motion on Flexjet's claims (Doc. 135) is denied, MPC's motion on Learjet's interim lift damages (Doc. 137) is denied, MPC's motion on Learjet's fraud claims (Doc. 139) is granted in part and denied in part, and plaintiffs' joint motion regarding breach of warranty (Doc. 141) is granted as to plaintiff Learjet and denied as to plaintiff Flexjet; and Learjet's motion on MPC's counterclaim (Doc. 141) is granted in part and denied in part.

As previously noted, all of the motions and briefs which are the subject of this Memorandum and Order were filed under seal.  (Doc. 133. 134.)  The Court is therefore filing the present Memorandum and Order under seal.  However, the Court does not believe that any portion of this Memorandum and Order contains information which justifies the continued sealing of this document.  Accordingly, the parties are given until **July 25, 2008** to file with the Court (under seal) any arguments as to why specific portions of this Memorandum and Order should or should not be kept under seal.  No responses will be permitted.  The parties should meet and confer prior to filing their briefs to see if an agreement can be reached on this issue. The parties should also consider at their conference whether all or part of their motions, briefs and supporting exhibits should be unsealed at this time. After reviewing the parties' briefs, the court will determine which portions of the

record will be permitted to remain sealed.  Finally, the parties are advised that the

Court does not intend to try this case based on sealed testimony or exhibits absent

the most compelling reasons.

## VI.  TRIAL SCHEDULING ISSUES

This case is currently set for trial on **August 26, 2008.**  The Court is

concerned with the large number of seemingly unresolved issues in this case as

evidenced by the fact that there is no final pretrial order in place and the proposed

pretrial order submitted to the Court appears to require substantial refinement and

modification.  The Court is therefore setting a telephone status conference with

counsel for **July 22, 2008 at 10:00 a.m.**  to discuss trial issues and procedures. The

Court will place the call.  If any counsel of record will not be at their office to

participate in the call, they should contact Angela Whittle at 316.269.6139 at least

24 hours prior to the call to provide a telephone number where they can be reached

for the conference.

The Court is also setting the following deadlines for matters leading up to

trial.

1.    The parties are directed to submit a single revised pretrial order

(which shall incorporate rulings in this Memorandum and Order) not

later than **July 25, 2008.**

2.      A pretrial conference will be held on **August 1, 2008 at 10:00 a.m.** in Room 406, U.S. Courthouse, Wichita, Kansas.  Trial counsel shall appear in person for the conference.

3.      Any motions in limine, including any motions directed to expert testimony under *Daubert* or *Khumo Tire*, and proposed jury instructions shall be filed by **July 31, 2008;** any responses to the motions and objections to the proposed jury instructions shall be filed by **August 8, 2008.**

4.      An in limine conference will be held on **August 15, 2008 at 10:00 a.m.** in Room 406, U.S. Courthouse, Wichita, Kansas.  Trial counsel shall appear in person for the conference.

Any requested modification or revision of the above deadlines can be presented at the telephone status conference on July 22, 2008.  Because the parties have participated in a mediation conference with Mr. Ron Williams, the Court is not requiring any further mediation conferences at this time.  If counsel intend to pursue any further mediation efforts, they should advise the Court at the telephone status conference.

**IT IS SO ORDERED**.

Dated at Wichita, Kansas on this 9th day of July, 2008.

  s   Donald W. Bostwick
DONALD W. BOSTWICK
U.S. MAGISTRATE JUDGE